Cassandra JOHNSON *v.* STATE of Arkansas

CR 05-1030

233 S.W.3d 123

Supreme Court of Arkansas
Opinion delivered March 23, 2006

*Mike Dabney*, for appellant.

*Mike Beebe*, Att'y Gen., by: *Brent P. Gasper*, Ass't Att'y Gen., for appellee.

Tom Glaze, Justice. The body of George Russell was discovered in his Blytheville apartment on July 14, 2004. Blytheville police picked up appellant Cassandra Johnson for questioning on August 4, 2004. While police were interviewing Johnson, other officers spoke with Tracy McNichols, who identified Johnson and a man named John Bolan as having killed Russell. After learning of McNichols's statement, Johnson gave a statement in which she admitted being at the scene, but denied participating in the murder. Johnson was arrested and charged with capital murder and aggravated robbery on September 29, 2004. Johnson subsequently filed a motion to suppress her statement to police; after a hearing, the trial court denied her motion, finding that the statement was voluntary and was not the product of police coercion. Johnson was tried by a Mississippi County jury on June 28-29, 2005; the jury convicted her of capital murder and aggravated robbery, for which she was sentenced respectively to life imprisonment without parole and twenty years.

Johnson filed a timely notice of appeal, and now raises three arguments for reversal, including a challenge to the sufficiency of the evidence. Although Johnson raises her sufficiency challenge as her third point on appeal, double jeopardy considerations require this court to consider it first. *See Standridge v. State*, 357 Ark. 105, 161 S.W.3d 815 (2004); *Grillot v. State*, 353 Ark. 294, 107 S.W.3d 136 (2003).

Johnson was charged with capital-felony murder. A person commits capital murder if, "[a]cting alone or with one (1) or more other persons[,] the person commits or attempts to commit . . . robbery." Ark. Code Ann. § 5-10-101(a)(1)(A)(v) (Repl. 2006). "A person commits robbery if, with the purpose of committing a felony or misdemeanor theft or resisting apprehension immediately after committing a felony or misdemeanor theft, the person employs or threatens to immediately employ physical force upon another person." Ark. Code Ann. § 5-12-102(a) (Repl. 2006). Johnson argues that there was insufficient evidence to corroborate

the testimony of Tracy McNichols, an accomplice, on the issue of the use of force in committing the underlying robbery.

When reviewing the sufficiency of the evidence, we determine whether there is substantial evidence to support the verdict, viewing the evidence in a light most favorable to the State. *Tate v. State*, 357 Ark. 369, 167 S.W.3d 655 (2004). Arkansas Code Annotated § 16-89-111(e)(1) (1987) provides that a person cannot be convicted of a felony based upon the testimony of an accomplice, unless that testimony is "corroborated by other evidence tending to connect the defendant with the commission of the offense." Corroboration is not sufficient if it merely establishes that the offense was committed and the circumstances thereof. *Martin v. State*, 346 Ark. 198, 57 S.W.3d 136 (2001). It must be evidence of a substantive nature since it must be directed toward proving the connection of the accused with a crime and not directed toward corroborating the accomplice's testimony. *Id.* The test is whether, if the testimony of the accomplice were completely eliminated from the case, the other evidence independently establishes the crime and tends to connect the accused with its commission. *Marta v. State*, 336 Ark. 67, 983 S.W.2d 924 (1999).

As part of its case-in-chief, the State called Tracy McNichols as a witness, who testified that she had known Johnson since about 2002. On the day that Russell was killed in July of 2004, McNichols asked Johnson and Johnson's boyfriend, John Bolan, for a ride. Johnson wanted to stop at Russell's apartment to get some money from him. McNichols indicated that Johnson had gotten money from Russell in the past by performing sexual acts. When the three arrived at the Capri Apartments, where Russell lived, Johnson asked McNichols to go inside the apartment with her so that Russell would give Johnson money without her having to have sex with him. McNichols did not go inside the apartment, but instead waited outside the door. Bolan waited in the car, and McNichols returned to the car a few minutes later.

Shortly thereafter, Johnson came back to the car and asked Bolan to go inside the apartment with her; McNichols stayed in the car. After a while, McNichols heard a noise that prompted her to go see what was taking Johnson and Bolan so long. As she stood outside the apartment door, she heard Johnson and Bolan demanding money from Russell. She then saw Johnson holding Russell's hands down, and Bolan holding him up against a wall. McNichols described the scene as looking like Johnson was holding Russell's hands down so that he could not move. The two did not notice

McNichols immediately, but when they did, Bolan told her to return to the car. McNichols stood outside for a minute, and in an apparent attempt to get Johnson and Bolan to leave, lied and told them that the police were coming. Johnson and Bolan came out of the apartment. As the three went to get back in the car, Bolan turned to McNichols and said, "This ain't never happened." When McNichols asked if they had robbed Russell, Bolan said, "No matter what we did, you just be quiet, this ain't never happened. And you say anything else, we all goin' to jail." McNichols then walked to the apartment of a friend who lived in the same apartment complex and stayed there for a while.

After about a day and a half, she said that she looked out of the window and saw the police over at Russell's apartment. She did not speak to the police at that time, because she thought Russell might have "just died on his own." A few days later, however, she saw an article in the paper describing Russell's death as a homicide. When she next saw Johnson, Johnson said that she had been to speak with the police, and that McNichols needed to go talk to them as well. McNichols asked Johnson what Johnson had told the police; Johnson said that she had just told them that she and Bolan had given McNichols a ride to the Capri Apartments. In McNichols's first statement to the police, she denied having been present at Russell's apartment. However, in a subsequent statement, she related the events of that day as described above.

The State also introduced the statement that Johnson gave to police regarding the crime. In that statement, Johnson described how she, Bolan, and McNichols went to Russell's apartment in order to try to get money from Russell. She said that when Bolan came inside, he began demanding money, but Russell said that he did not have any. Bolan then began patting on Russell's pockets, and Johnson grabbed Russell's arms in what she described as an attempt to pull him away from Bolan. Bolan then pushed Russell against the wall. She said that Russell was trying to struggle, and she attempted to pull Russell toward her. Bolan grabbed a bag and put it over Russell's face, and slammed his head against the wall at least twice. Johnson claimed that she did not realize that Bolan had killed Russell, but she ran away because she was afraid Bolan was going to beat her.

On appeal, Johnson concedes that her statement corroborates McNichols's testimony that Johnson went into the apartment with Bolan; however, she argues that her statement did not

corroborate McNichols's evidence to the effect that Johnson used force on Russell. As noted above, in order to prove that Johnson was guilty of capital murder, the State had to prove that she committed the underlying offense of robbery; in order to prove robbery, the State had to demonstrate that she employed or threatened to immediately employ physical force upon another person. Johnson argues that, once one eliminates McNichols's testimony that Johnson held Russell's arms down so that Bolan could beat him, the only other evidence was her own statement, and in that statement, she said that she was trying to help Russell, not harm him. Thus, she contends, there was no evidence that corroborated McNichols's testimony about force.

■ Here, Johnson's own statement connected her with the commission of the crime. Although she argues that her statement showed that she was trying to help Russell, her credibility was an issue for the jury, which was free to believe all or part of her testimony and to resolve questions of conflicting testimony and inconsistent evidence. See Polk v. State, 348 Ark. 446, 73 S.W.3d 609 (2002); Solomon v. State, 323 Ark. 178, 913 S.W.2d 288 (1996) (the jury was entitled to believe the State's witnesses and to disbelieve the appellant's evidence). Accordingly, we conclude that there was substantial evidence to support Johnson's conviction.

In her second point on appeal, Johnson argues that the trial court erred in denying her motion for a mistrial. During McNichols's testimony, the following exchange occurred between the prosecutor and the witness:

> PROSECUTOR: When the police had picked you up, at first you denied being there?
>
> McNICHOLS: Yes, I did.
>
> PROSECUTOR: And why did you deny being there?
>
> McNICHOLS: Because I didn't really think that they had killed Mr. Russell. I didn't want to believe it. That's why and I didn't want to get in trouble for not calling the police when we was over there. That's why.
>
> PROSECUTOR: And then after some information was brought to your attention, you ended up telling them what you remembered as far as what had happened?

McNichols: Yes. After I took a lie detector test, I told 'em what happened to Mr. Russell.

Johnson immediately approached the bench and moved for a mistrial. The trial court denied the motion, noting that McNichols's comment was not elicited by the State. Johnson declined to request a cautionary instruction, stating her opinion that it would only draw more attention to the comment.

Johnson argues that it was error for the court to deny her mistrial motion. She contends that the effect of McNichols's comment about having taken a lie detector test was to bolster her credibility, because the jury could infer from her statement that, once she had taken the polygraph, she confessed truthfully. Johnson urges that, because McNichols was the only witness to testify that Johnson's actions facilitated the murder, McNichols's credibility was crucial; the reference to the lie detector test unfairly bolstered her credibility and unduly prejudiced Johnson.

A mistrial is a drastic remedy, to be employed only when an error is so prejudicial that justice cannot be served by continuing the trial, and when it cannot be cured by an instruction to the jury. *Peters v. State*, 357 Ark. 297, 166 S.W.3d 34 (2004); *Walker v. State*, 353 Ark. 12, 110 S.W.3d 752 (2003). The decision to grant a mistrial is within the sound discretion of the trial court and will not be overturned absent a showing of abuse or manifest prejudice to the appellant. *Peters v. State, supra.*

The results of polygraph examinations are inadmissible in all Arkansas courts. *See* Ark. Code Ann. § 12-12-704 (Repl. 2003). However, in the instant case, although information about McNichols's having taken a polygraph examination was before the jury, there was no mention of any polygraph result. This court recently addressed a similar situation in *Peters, supra*, in which one of the State's witnesses blurted out that the defendant, Peters, missed an appointment for a polygraph examination. Peters moved for a mistrial, which was denied. Peters argued to both the trial court and this court that the reference to a missed polygraph test was unduly prejudicial, because the only conclusion the jury could have come to was that he missed the appointment because he was guilty and afraid of failing the test. *Peters*, 357 Ark. at 301.

In affirming Peters's conviction, this court cited *Wingfield v. State*, 303 Ark. 291, 796 S.W.2d 574 (1990), as follows:

> While neither the results of a lie detector examination nor testimony that indirectly or inferentially apprises a jury of the results

> of a lie detector examination are admissible, the fact that the jury is apprised that a lie detector test was taken is not necessarily prejudicial if no inference as to the result is raised or if any inferences that might be raised as to the result are not prejudicial. *See Johnson v. Florida*, [166 So. 2d 798 (Fla. 1964)].
>
> Consequently, a witness's veracity can not be bolstered or discredited by proof of his taking or refusing a lie detector test, and evidence of a witness's willingness or reluctance to be examined is also prejudicial and inadmissible to prove consciousness of innocence or of guilt. *Id.*

*Wingfield*, 303 Ark. at 296–97 (as cited in *Peters*, 357 Ark. at 303-04). The *Peters* court concluded that there was no error in the denial of Peters's mistrial motion because the jurors were polled individually, and all indicated that they drew no inference from the remarks about the polygraph examination. *Peters*, 357 Ark. at 305. The court also noted that the State had not deliberately elicited the reference or used it in any way to prove consciousness or innocence or of guilt. *Id.*

In addition, in *Ferguson v. State*, 343 Ark. 159, 33 S.W.3d 115 (2000), this court held that, when it was not evident from the witness's testimony how the defendant scored on the polygraph test, there was no prejudicial inference to be drawn from the witness's remarks. The *Ferguson* court noted that the "fact that the jury is apprised that a lie detector test was taken is not necessarily prejudicial *if* no inference as to the result is raised or *if* any inferences that might be raised as to the result are not prejudicial." *Ferguson*, 343 Ark. at 177-78 (emphasis in original).

■ In the present case, as in *Peters* and *Ferguson*, the State did not elicit McNichols's comment about the polygraph, and nothing in her testimony indicated how she had performed on the test; she simply stated that she had taken a lie detector test, without revealing the results. Thus, the comment raised no inference as to the result of the test, and the trial court did not abuse its discretion in denying Johnson's motion for mistrial.

Finally, Johnson argues that her confession to the Blytheville police was involuntarily given, as she was under the influence of cocaine at the time, and she contends that the trial court erred in denying her motion to suppress her statement. In *Grillot v. State*, 353 Ark. 294, 107 S.W.3d 136 (2003), this court clarified the appropriate standard of review for cases involving a trial court's

ruling on the voluntariness of a confession: We make an independent determination based upon the totality of the circumstances. *Grillot*, 353 Ark. at 310; *Cox v. State*, 345 Ark. 391, 47 S.W.3d 244 (2001). A statement made while in custody is presumptively involuntary, and the burden is on the State to prove by a preponderance of the evidence that a custodial statement was given voluntarily and was knowingly and intelligently made. *Jones v. State*, 344 Ark. 682, 42 S.W.3d 536 (2001). In order to determine whether a waiver of *Miranda* rights is voluntary, this court looks to see if the confession was the product of free and deliberate choice rather than intimidation, coercion, or deception. *Id.*

Further, when an appellant claims that his confession was rendered involuntary because of drug or alcohol consumption, the level of his comprehension is a factual matter to be resolved by the trial court. *Grillot, supra*; *Jones, supra*. While this court will make a closer examination of the appellant's mental state, we still leave the factual question to the trial court on whether the accused had sufficient capacity to waive his rights. *Jones*, 344 Ark. at 689. In testing the voluntariness of one who claims intoxication at the time of waiving his rights and making a statement, this court determines whether the individual was of sufficient mental capacity to know what he was saying — capable of realizing the meaning of his statement — and that he was not suffering from any hallucinations or delusions. *Id.*

Testimony taken during the suppression hearing revealed the following facts. Blytheville narcotics officer Jeffrey Wicker testified that Johnson had come to the police station earlier in the day on August 4, 2004; Wicker picked Johnson up at the B-Q Studios and invited her to come back to the station about 6:45 p.m. that same day. Wicker read Johnson her *Miranda* rights at 7:03 p.m. After advising Johnson of her rights, Wicker began questioning her about the murder. At first, Johnson denied having been present. However, later in the evening, Wicker and two other officers interviewed her again and took a recorded statement at 10:08 p.m. in which she admitted her involvement in the crime. Wicker testified that Johnson appeared to give her statement voluntarily and that she was able to answer questions; in addition, although she "appear[ed] a little uptight," she was responsive to the questions asked of her.

On cross-examination, Wicker agreed that, when he picked her up earlier in the evening, she was "kind of fidgety" and "nervous acting," and agreed that people who are under the

influence of cocaine are "fidgety, nervous type, looking in all directions." When asked if Johnson appeared to be under the influence of cocaine when she was picked up, Wicker replied, "If I had to guess, yes sir." However, Wicker also noted that approximately three hours had elapsed between the time he picked Johnson up and the time she gave her statement, and that the "average crack high" only lasts fifteen minutes. Accordingly, when she gave her statement, Wicker believed that she was "fit to give a statement." Further, on re-direct examination, Wicker also pointed out that Johnson's demeanor that day was consistent with her demeanor every other time he had seen her, and that a regular crack user like Johnson manifested fidgety, nervous symptoms all the time.

Detective David Flora of the Blytheville Police Department was also present for Johnson's interview. Flora, who stated that he had known Johnson for years, said that Johnson was coherent and acknowledged all of the questions he asked of her. Flora also stated that he thought Johnson had a drug problem, but on this occasion, she did not appear to be under the influence. Flora described her as having "no hyperintensity as far as narcotics use or anything. She was more laid-back like she was coming down, and you know, just tired — not really tired but relaxed . . . [w]here she was coming off of it."

On cross-examination, Flora contrasted Johnson's behavior on the day she gave her statement with her demeanor during an encounter with the police a few weeks earlier. On July 21, 2004, Johnson had voluntarily come to the police department for general questioning about the crime. That day, Flora said, Johnson appeared to be under the influence of stimulants; she was extremely fidgety and could not sit still, and Flora would have to ask her questions two or three times before he could get an answer out of her. At 7:00 in the evening on August 4, 2004, however, she was "normal" and did not become nervous until she realized that she was being questioned about Russell's murder.

Johnson also testified at the suppression hearing, stating that she had done "quite a bit" of cocaine on August 4, 2004, and that the drug made her paranoid, nervous, and jittery. She stated that she had "shot up" with crack just before officers brought her to the police station, and that the effect of the cocaine was to make her afraid. She also claimed that the influence of the cocaine caused her to lie about her involvement in the crime, because her "body was wearing down and [she] was tired." On cross-examination, how-

ever, she agreed a cocaine high lasted "probably twenty minutes." She also agreed that it had been about three hours since her last hit when she gave her statement, and that Flora had reminded her that she had been advised of her rights.

■ Given this evidence, the trial court did not err in denying Johnson's motion to suppress her statement. Most importantly, Johnson herself testified that a cocaine high only lasted about twenty minutes, and she did not give her tape-recorded statement until more than three hours after she had been brought to the police station. And although she signed the waiver-of-rights form at 7:03 p.m., at a time when she might arguably still have been under the influence of the drugs, she acknowledged at the beginning of her statement that she had been informed of her rights and signed the waiver. Both of the officers who testified about her demeanor stated that, while she was nervous and fidgety, she always appeared that way; they both also stated that, at the time she gave her taped statement, she appeared fit to do so. Based on a review of the evidence, the trial court's decision was not clearly against the preponderance of the evidence.

Because Johnson received a sentence of life imprisonment, the record in this case has been reviewed pursuant to Ark. Sup. Ct. R. 4-3(h) for adverse rulings objected to by Johnson but not argued on appeal. No such reversible errors were found. For the aforementioned reasons, the judgment of conviction is affirmed.