Steven Victor WERTZ  *v.*  STATE of Arkansas

CR 07-1155                                              287 S.W.3d 528

Supreme Court of Arkansas
Opinion delivered September 18, 2008

*Gregory E. Bryant*, for appellant.

*Dustin McDaniel*, Att'y Gen., by: *Deborah Nolan Gore*, Ass't Att'y Gen., for appellee.

Paul E. Danielson, Justice. Appellant Steven Wertz appeals from his convictions on two counts of capital murder and his sentence of death. He asserts four points on appeal: (1) that the evidence did not sufficiently corroborate the accomplice testimony; (2) that the jury erred in finding the existence of an aggravator during the sentencing phase; (3) that the jury erred in finding no mitigating

circumstance; and (4) that various considerations should be taken into account during this court's review pursuant to Arkansas Rule of Appellate Procedure–Criminal 10 (2008). We affirm Wertz's convictions and sentence.

The facts, as derived from the record, are these. On the morning of December 31, 1986, Kathy and Terry Watts were found dead in their Ash Flat home by Kathy's mother, Judy Bone. Ms. Bone found their almost one-year-old son, alive, near his father's body. During the investigation into the Wattses' deaths, it was discovered that a child-custody matter regarding another child was ongoing between Terry Watts and Wertz's then-wife, Belinda. Ultimately, Wertz became the primary suspect, and, the same day that the bodies were discovered, investigators traveled to Oklahoma, where the Wertzes resided, to inquire.

At that time, Wertz told investigators that he and Jamie Snyder, Jr., the son of a friend, spent the night at Wertz's home on December 30, 1986. Wertz claimed that he had been sick that evening and that he had gone to the Tinker Air Force Base clinic the next day for treatment, which records corroborated. In addition to Wertz, another suspect was also investigated. In 1989, Glenn Collins, an inmate at the Arkansas Department of Correction, wrote two letters to the chief of the Ash Flat Police Department in which he confessed to committing two murders in Ash Flat "some three years ago." However, after being interviewed, Collins was eliminated as a suspect because, according to one investigator, his story did not match the crime scene. It appears from the record that, despite having suspects, police neither arrested nor charged anyone in connection with the murders until much later.

In spring 2001, David Huffmaster of the Sharp County Sheriff's Department began to review the case file on the Wattses' murders after being contacted by Kathy Watts's sister, Chris Lindner, at a school function. In spring 2002, Huffmaster essentially reopened the case and, over the course of the next few years, conducted interviews of some of the persons previously interviewed and involved in the original investigation. Huffmaster's interviews of both Belinda Stewart, who had been married to Wertz at the time of the crimes, but had since divorced him and remarried, and Jamie Snyder, Jr., yielded statements that led to an arrest warrant being issued for Wertz on April 27, 2006. On April 28, 2006, a felony information was filed, charging Wertz with two

counts of capital murder. He was tried by a jury, was convicted, and as already stated, was sentenced to death. He now appeals.

## I. Corroboration of Accomplice Testimony

For his first point, Wertz asserts that there was insufficient evidence to corroborate the accomplice testimony of Jamie Snyder, Jr. He contends that if Snyder's testimony were eliminated, the independent evidence remaining would eliminate Wertz as the perpetrator of the crimes. He further asserts that other evidence introduced at trial going to opportunity, method, and time of death, did not corroborate Snyder's testimony, and he points to the testimony he believes eliminates him as the perpetrator. The State responds that the evidence the prosecution presented of Wertz's motive, threats, and opportunity, as well as Wertz's conduct and statements before and after the murders, was more than adequate to connect him with the commission of the crimes.

Here, Wertz challenges the sufficiency of the State's evidence corroborating Snyder's testimony. During his trial, Wertz moved for a directed verdict, arguing that there was insufficient corroboration of Snyder's testimony. His motion was denied, and he again moved for a directed verdict on this basis after the defense rested. That motion, too, was denied. We treat a motion for directed verdict as a challenge to the sufficiency of the evidence. *See Stephenson v. State*, 373 Ark. 134, 282 S.W.3d 772 (2008). The test for determining the sufficiency of the evidence is whether the verdict is supported by substantial evidence, direct or circumstantial. *See id.* Evidence is substantial if it is of sufficient force and character to compel reasonable minds to reach a conclusion and pass beyond suspicion and conjecture. *See id.* On appeal, we view the evidence in the light most favorable to the State, considering only that evidence that supports the verdict. *See id.*

Wertz was convicted of two counts of capital murder. Under Arkansas law in 1986, a person committed capital murder if "with the premeditated and deliberated purpose of causing the death of any person, he causes the death of two (2) or more persons in the course of the same criminal episode[.]" Ark. Stat. Ann. § 41-1501(c) (Repl. 1977 & Supp. 1985). We have held that the premeditation and deliberation required may be formed in an instant. *See Winston v. State*, 372 Ark. 19, 269 S.W.3d 809 (2007); *Shipman v. State*, 252 Ark. 285, 478 S.W.2d 421 (1972). We have further observed that intent can rarely be proven by direct evi-

dence; however, a jury can infer premeditation and deliberation from circumstantial evidence, such as the type and character of the weapon used; the nature, extent, and location of wounds inflicted; and the conduct of the accused. *See Winston, supra.*

A felony conviction cannot be had upon the testimony of an accomplice unless corroborated by other evidence tending to connect the defendant with the commission of the offense. *See* Ark. Stat. Ann. § 43-2116 (Repl. 1977).[1] Corroboration is not sufficient if it merely shows that the offense was committed and the circumstances thereof. *See id.* Corroborating evidence must be evidence of a substantive nature since it must be directed toward proving the connection of the accused with a crime and not directed toward corroborating the accomplice's testimony. *See Johnson v. State*, 366 Ark. 8, 233 S.W.3d 123 (2006). It need not be sufficient standing alone to sustain the conviction, but it must, independent from that of the accomplice, tend to connect to a substantial degree the accused with the commission of the crime. *See Green v. State*, 365 Ark. 478, 231 S.W.3d 638 (2006). The test for corroborating evidence is whether, if the testimony of the accomplice were completely eliminated from the case, the other evidence independently establishes the crime and tends to connect the accused with its commission. *See id.* While corroborating evidence may be circumstantial so long as it is substantial, evidence that merely raises a suspicion of guilt is insufficient to corroborate an accomplice's testimony. *See id.*

We begin by outlining Snyder's testimony. Snyder testified that on the day of the murders, he received a phone call from Wertz, during which Wertz told him that he needed "some help with the matter of Terry Watts." After meeting Wertz at the armory to turn in some National Guard gear, Snyder and Wertz went to Wertz's home, arriving between 4:00 and 4:30 p.m. Snyder stated that, while there, Wertz retrieved a shotgun from his home and put it in Snyder's mother's car, which Snyder was driving. They then left Wertz's home. Driving toward Guthrie, Oklahoma, where some of Terry Watts's relatives lived, Wertz told Snyder that he expected Terry Watts to be at the Guthrie home. According to Snyder, Wertz further explained that there would likely be five to eight people at the home, including children, and that "anyone over eight would need to be eliminated

---

[1] This requirement remains virtually unchanged and is now codified at Arkansas Code Annotated § 16-89-111(e)(1) (Repl. 2005).

as a possible witness." When Snyder conveyed his concerns about "including anybody else, especially children[,]" Wertz told him that he "would take care of the children and that we would not abort and that I didn't want to make myself expendable." Upon driving down a road in Guthrie, Wertz told Snyder that "they" were not there and that he and Snyder "would head over to Arkansas." They did so, and during the trip, Wertz told Snyder that if they encountered any "law enforcement interference[,]" they "would abort the mission."

Upon arriving in Ash Flat near midnight, Snyder testified that he and Wertz exited the car, taking shotguns, and approached the front door of the home by its porch. He said that Wertz had him knock on the door, which Snyder did. Snyder stated that a male came to the door, looked out, and began to open the door, when Wertz stepped forward. At that time, the male, whom Snyder assumed was Terry Watts, slammed the door closed and yelled "Steve." At that time, according to Snyder, Wertz fired his shotgun, and Snyder quickly turned to leave. Snyder stated that he believed that Wertz then kicked the door and entered the house. While standing beside the front porch, Snyder heard two or three more shots.

Snyder testified that, as Wertz came out of the house after being inside for no more than five minutes, Snyder returned to the car. He stated that when Wertz entered the passenger's side of the car, he was laughing and said that "Kathy Watts had a nice body" or "words to that effect." Snyder said that he turned the car around and exited the property. After Snyder made a wrong turn, Wertz took over driving. Snyder testified that, during their return trip, Wertz told him: "[I]f there were any questions, we had spent the night at the — at his residence in Cushing. And that he had been ill as if with the flu. And that he would go to Tinker Air Force Base on sick call upon our return to give credibility to the alibi." Snyder said that they returned to Wertz's home "in the area of 7:00" the morning of December 31.

Our review of the record reveals that there was sufficient evidence to corroborate Snyder's testimony. Judy Bone testified that on the morning of December 31, 1986, she found both Kathy and Terry Watts dead in their home. Dr. Charles Kokes, the Chief Medical Examiner for the Arkansas State Crime Lab, testified that the autopsy reports revealed that Kathy suffered a number of shotgun-related injuries and that Terry was struck by two separate

shotgun discharges and had a horizontal cut across his neck.[2] Steve Huddleston, a former investigator with the Arkansas State Police, testified that a total of four shotgun shells were recovered from the crime scene.

In addition, evidence was presented that Wertz had made several threats to Terry Watts. Jeffery Birt testified that about one week prior to December 18, 1986, he heard Wertz say, "[W]e did it their way. Now we are going to do it my way." Birt observed that Wertz was complaining about the cost of the custody matter, that things were not going his way, and that it was time to do it his way. John Watts testified that, in July 1986, he went with Terry Watts to pick up his daughter from the Wertzes' home. He stated that as they were leaving, Wertz said, "[I]t was a long way back to Arkansas."[3] Finally, Tom Garner, the attorney who aided Terry Watts with his custody matter, testified that at some time in December 1986, Terry came to him and told him that he wanted to make a will. Garner said that Terry told him he wanted to get his affairs in order in case something happened to him because, after his last custody hearing, Wertz told Terry "he was a dead man."

Finally, further corroborating Snyder's testimony was the testimony of Belinda Stewart, Wertz's former wife, who was married to him at the time of the murders. She testified that, during the time she had her daughter for visitation after Christmas of 1986, Wertz told her daughter several times that she would not have to go back to her father's. Belinda further testified that on December 30, she saw her husband and Snyder at her house around 4:00 or 4:30 p.m. She said that after 4:30 p.m., she did not see Wertz the rest of the day. She said that the next time she saw him was early the next morning, as the sun was starting to rise. She further testified, "He just said that if anybody asked that he was home the whole night and that he was at the Armory through — during the day time." She said that when Wertz left the house at 4:00 p.m. the day of the murders, he took a bag with him. She further stated that while they had several guns in their home in a closet, she noticed that a little shotgun was missing.

---

[2] Dr. Kokes did not perform the Wattses' autopsies, but testified in place of the medical examiners who conducted the autopsies following the murders based on their reports.

[3] As stated in his brief, Wertz does not dispute the testimony of either Watts or Birt that he threatened Terry Watts during the Oklahoma child-custody matter.

After eliminating Snyder's testimony, we hold that the other evidence independently establishes the crimes and tends to connect Wertz with their commission. The crimes were clearly established by the testimony of Ms. Bone, Dr. Kokes, and Investigator Huddleston.[4] We must turn, then, to whether the other testimony tends to connect Wertz to the crimes. It clearly does.

As set forth above, Wertz made several threats to the victim on different occasions, and we have held that proof of ill will and threats is sufficient to corroborate an accomplice's testimony. *See Stephenson v. State*, 373 Ark. 134, 282 S.W.3d 772 (2008); *Sargent v. State*, 272 Ark. 336, 614 S.W.2d 503 (1981). Moreover, Wertz told Belinda, his then-wife, to tell anyone who asked that he was home on the night in question when she said he was not, and we have held that a family member's testimony that he or she was asked to lie about an appellant's whereabouts during the commission of a crime is sufficient to connect the appellant to the crimes as well as corroborate an accomplice's testimony. *See Stephenson, supra.* In addition, Belinda's testimony that Wertz was not home on the night in question, that he took a bag with him when he left, that a shotgun was missing, and that he told her daughter that she would not have to return to her father's home was circumstantial evidence of Wertz's involvement. As we have already stated, corroborating evidence may be circumstantial, so long as it is substantial. *See Green v. State*, 365 Ark. 478, 231 S.W.3d 638 (2006). In accord with the statute and our case law, we hold that the foregoing testimony establishes the crimes and tends to connect Wertz with their commission.

We further note that in support of his argument on this point, Wertz points to the many inconsistencies he believes were present in the testimony of the various witnesses, as well as the fact that he presented evidence that he believes contradicted Snyder's testimony. Admittedly, there are discrepancies. However, factual discrepancies in the testimony are not for this court to resolve, as the credibility of witnesses is an issue for the jury and not this court. *See Burley v. State*, 348 Ark. 422, 73 S.W.3d 600 (2002). The jury may resolve questions of conflicting testimony and inconsistent evidence and may choose to believe the State's account of the facts rather than the defendant's. *See Dunn v. State*, 371 Ark. 140, 264 S.W.3d 504 (2007). Because our review of the record reveals

---

[4] We note that Wertz states in his brief that he does not dispute that the Wattses were murdered.

that there was sufficient corroborating evidence to support Snyder's testimony, we affirm Wertz's convictions and sentence as to this point.

## II. Existence of an Aggravator

As his second point, Wertz avers that the prosecution presented no evidence supporting the notion that Wertz knew the Wattses' infant son, Joshua, was in the house at the time of the murders. For that reason, he claims, the State did not prove the aggravator that he knowingly created a great risk of death to a person other than the victim. The State urges that Wertz's challenge is without merit. It contends that it presented substantial evidence in support of the aggravator at issue, which demonstrated that Wertz knowingly fired a shotgun into a house where he knew a baby resided.

Whenever there is evidence of an aggravating or mitigating circumstance, however slight, the matter should be submitted to the jury for consideration. See Roberts v. State, 352 Ark. 489, 102 S.W.3d 482 (2003). Once the jury has found that an aggravating circumstance exists beyond a reasonable doubt, this court may affirm only if the State has presented substantial evidence in support of each element therein. See id. Substantial evidence is that which is forceful enough to compel reasonable minds to reach a conclusion one way or the other and permits the trier of fact to reach a conclusion without having to resort to speculation or conjecture. See id. To make this determination, we view the evidence in the light most favorable to the State to determine whether any rational trier of fact could have found the existence of the aggravating circumstance beyond a reasonable doubt. See id.

During sentencing, the jury was instructed on two aggravating circumstances:

> (4) the person in the commission of the capital murder knowingly created a great risk of death to a person other than the victim; [and]

> (5) the capital murder was committed for the purpose of avoiding or preventing an arrest or effecting an escape from custody[.]

Ark. Stat. Ann. § 41-1303 (Repl. 1977 & Supp. 1985). On appeal, Wertz argues that there was insufficient evidence to support a finding of the former.

After viewing the evidence in the light most favorable to the State, we hold that the jury could have determined beyond a reasonable doubt that Wertz knowingly created a great risk of death to the Wattses' child, Joshua. Ms. Bone testified that she found Joshua in the Wattses' home, near his father's lifeless body. Shotgun shells were found both in the living room area of the home, where Joshua was found, as well as in a bedroom in which was Joshua's crib. Prior to the murders occurring, Wertz told Snyder that children might be present and that those over eight would need to be eliminated as possible witnesses. In addition, David Huffmaster testified that, based on his review and his investigation and the investigatory file, Wertz was aware that the Wattses had an infant son. We hold that this evidence is substantial evidence that Wertz knowingly created a great risk of death to Joshua Watts, a person other than the victims. We, therefore, affirm on this point as well.

### III. Failure to Find a Mitigating Circumstance

Wertz next asserts that despite the fact that the jury was made aware that he did not have any criminal history, it erroneously found that no mitigation existed. The State, on the other hand, maintains that the jury did not err in so finding as the jury was not provided with proof that Wertz had no significant prior criminal history. It avers that the jury was made aware that Wertz had no criminal history by way of defense counsel's closing argument and that statements by counsel are not evidence that can be properly relied upon by the jury.

We have previously held that a jury is not required to find a mitigating circumstance just because the defendant puts before the jury some evidence that could serve as the basis for finding the mitigating circumstance. *See Hill v. State*, 331 Ark. 312, 962 S.W.2d 762 (1998). In addition, we have recognized that a jury may generally refuse to believe a defendant's mitigating evidence; however, when there is no question about credibility and when objective proof makes a reasonable conclusion inescapable, the jury cannot arbitrarily disregard that proof and refuse to reach that conclusion. *See Roberts v. State*, 352 Ark. 489, 102 S.W.3d 482 (2003).

It is clear to this court that the jury did not erroneously reject any mitigating circumstance. Our review of the record reveals that the only reference to Wertz's alleged lack of criminal history was

made during defense counsel's closing argument during the sentencing phase. Defense counsel's credibility aside, we are unable to find any objective proof that was presented of Wertz's alleged lack of criminal history, which would have made a reasonable conclusion inescapable.[5] Moreover, the jury had been instructed that counsel's arguments were just that, arguments, were not evidence, and, in fact, should be disregarded if there was no basis in the evidence for the argument:

> [e] Opening statements, remarks during the trial, and closing arguments of the attorneys are not evidence, but are made only to help you in understanding the evidence and applicable law. Any argument, statements, or remarks of attorneys having no basis in the evidence should be disregarded by you.

For these reasons, it was within the jury's province to disregard or refuse to believe what Wertz claims was mitigating evidence. We, therefore, affirm as to this point as well.

### IV. Points for Rule 10 Consideration

For his fourth and final point, Wertz sets forth several issues that he believes warrant reversal of his convictions and should be reviewed by this court pursuant to Ark. R. App. P.–Crim. 10. Specifically, Wertz points to: (1) the fact that Snyder was convicted of manslaughter for his involvement and was sentenced to twenty years' imprisonment, with fifteen years suspended and more than 400 days' credit for time served; (2) the viability of Glenn Collins as an alternative suspect; (3) the fact that Snyder passed a polygraph examination when he first denied participation in the murders; (4) the admissibility of photographs from the crime scene; (5) his motion to dismiss premised upon the State's alleged failure to prove that Kathy Watts was indeed the victim of a homicide, due to the lack of identification of her by Judy Bone or

---

[5] We note on this point that the record reveals defense counsel's statement to the circuit court that Wertz refused to allow defense counsel to conduct a mitigation investigation. We further note that while there was testimony that Wertz served as a reserve police officer, which he appears to equate to further evidence that he had no criminal history, such evidence would in no way necessitate a finding by the jury of no criminal history. Certainly there have been persons who have served as an officer and also have had a criminal history.

David Lindner;[6] (6) the admissibility of a Polaroid photograph; (7) and Wertz's statement that he would kill anyone over the age of eight at the residence in Guthrie. Rule 10, in pertinent part, provides:

> (b) *Mandatory review.* Whenever a sentence of death is imposed, the Supreme Court shall review the following issues in addition to other issues, if any, that a defendant may enumerate on appeal. Counsel shall be responsible for abstracting the record and briefing the issues required to be reviewed by this rule and shall consolidate the abstract and brief for such issues and any other issues enumerated on appeal. The Court shall consider and determine:

> (i) pursuant to Rule 4-3(h) of the Rules of the Supreme Court and Ark. Code Ann. § 16-91-113(a), whether prejudicial error occurred;

> (ii) whether the trial court failed in its obligation to bring to the jury's attention a matter essential to its consideration of the death penalty;

> (iii) whether the trial judge committed prejudicial error about which the defense had no knowledge and therefore no opportunity to object;

> (iv) whether the trial court failed in its obligation to intervene without objection to correct a serious error by admonition or declaring a mistrial;

> (v) whether the trial court erred in failing to take notice of an evidentiary error that affected a substantial right of the defendant;

> (vi) whether the evidence supports the jury's finding of a statutory aggravating circumstance or circumstances; and

> (vii) whether the sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary factor.

Ark. R. App. P.–Crim. 10(b).

---

[6] David Lindner is Ms. Bone's son-in-law. He returned to the Wattses' home with Ms. Bone and saw the bodies.

Pursuant to Rule 10, we have reviewed the entire record, which includes those matters pointed to by Wertz, and we hold that no reversible error exists. We have further reviewed the record pursuant to Arkansas Supreme Court Rule 4-3(h) (2008), and no reversible error has been found.

For the foregoing reasons, we affirm the orders of conviction and sentence.

Affirmed.

GLAZE, J., not participating.