2010 Ark. App. 313

**Steven Ray SKOMP, Appellant**

v.

**STATE of Arkansas, Appellee.**

**No. CA CR 09–1185.**

Court of Appeals of Arkansas.

April 14, 2010.

Timothy R. Leonard, Hamilton & Hamilton, PLLC, Hamburg, for appellant.

Dustin McDaniel, Atty. Gen., by: Brad Newman, Little Rock, for appellee.

M. MICHAEL KINARD, Judge.

Steven Ray Skomp appeals from his conviction by a Bradley County jury on one count of abuse of an impaired person, D felony. On appeal, appellant challenges the sufficiency of the evidence to support his conviction. We affirm the judgment of the trial court.

On July 9, 2008, the State filed an amended felony information in which it charged appellant, Curtis Klines, Susie Klines, and Charles Skomp with one count each of abuse of an impaired person, B felony, and first-degree false imprisonment. Prior to trial, the State withdrew the first-degree false-imprisonment charge. At trial, Jeremy Chapman, who worked as a patrolman for the Warren Police Department in April and early May of 2008, testified that he was called to a hospital to take a report from Brenda Klines. After he spoke with Brenda, he contacted the Arkansas Department of Human Services (DHS). He then accompanied workers from DHS to the Klines residence. Chapman was present when the DHS workers interviewed the defendants. According to Chapman, appellant told the workers that he would make Brenda stand up against the wall on the tips of her toes and stretch her arms out as far as she could when she took his candy or his cell phone. Chapman testified that the workers asked him to take into evidence a piece of wood and a belt that were found in the home.

Mark Wargo, who is a licensed psychological examiner, performed a psychological evaluation of Brenda Klines. Wargo

testified that when he evaluated Brenda, she appeared older than her stated age. According to Wargo, Brenda also appeared undernourished, with low body weight and multiple bruises on her body. Wargo stated that he believed Brenda's skin sagged more than one would expect for a forty-nine-year-old female. Wargo testified that his examination found that Brenda met the criteria for moderate mental retardation. Wargo stated that Brenda functioned at a second-grade educational level. Wargo testified that Brenda told him the bruises occurred when she tripped over a bucket and fell; however, Wargo felt that the bruising covered more areas of her body than would have been caused by a single incident.

Shawn Hildreth, a criminal investigator with the Warren Police Department, testified that Susie Klines told him that Brenda would be made to stand in the corner facing the wall for long periods of time, up to two hours, and sometimes on one leg, for taking food and not cleaning the residence thoroughly. Hildreth testified that he attempted on one occasion during his investigation to stand on one leg, and was only able to do so for approximately thirteen minutes. Susie Klines also told Hildreth that the trailer in which Brenda stayed at night was sometimes locked in order to keep Brenda from coming out and taking food and to keep Brenda's sister out of the trailer. Susie then stated that they would only lock the trailer when they would leave to go run errands. Appellant also told Hildreth that Brenda would be forced to stand in the corner for up to an hour, sometimes on one leg. Appellant also said that he assumed Brenda's trailer was locked at night. Appellant told Hildreth he was not aware of Brenda ever falling down. Hildreth testified that all of the family members he interviewed said that Brenda's trailer had no electricity or running water, that Brenda had been pro-vided a five-gallon bucket to use as a toilet, and that she had a box fan to keep cool that was powered by an extension cord running from the house.

Denise Wright Smith, who was one of the DHS workers who interviewed the other adults in the Klines household, testified that when she saw Brenda Klines, she observed "a very malnourished, frail, thin woman, quite scary looking." Curtis Klines told the workers that if Brenda got into food or other things they did not want her to get into, they disciplined her by "whupping" her. He claimed that the board and belt were used to discipline the family's cat. Both of the Klineses told the workers that Brenda had behavior problems and would sometimes get out of control. They also said that Brenda did not need to eat sugar or salt due to health conditions. The refrigerator in Brenda's trailer was empty and the bathroom door was screwed shut. Charles Skomp told the workers that they would have Brenda stand in a corner on her tiptoes, and appellant confirmed that.

Dr. David Foscue testified that Brenda had been a patient of his for several years. Dr. Foscue testified that Brenda would present with malnutrition and some dehydration and that he addressed those issues with the Klineses. Dr. Foscue stated that Brenda's bruising would not have happened from a fall. Dr. Foscue could not determine exactly what happened to Brenda, but he was adamant that it was not a fall. Dr. Foscue also determined that Brenda's injuries were not the result of a seizure. Dr. Foscue testified that Brenda told him that she did not want to go home because she would "get a whupping." Dr. Foscue further testified that Brenda told her that "Mamma or Daddy" would "whup" her with a belt or a paddle and that "the boys" would hold her down when she got a "whupping." The last time that

it happened was a week before Brenda went into the hospital.

Brenda's sister, Louise Pitts, testified that Brenda came to live with her after she got out of the hospital. Pitts testified that when Brenda first came to her home, Brenda was terrified and had nightmares. She also stated that Brenda ate constantly. According to Pitts, Brenda weighed approximately 100 pounds when she first came to stay with her and 145 pounds a few weeks prior to the trial.

After the State rested its case, appellant made a motion for directed verdict. Appellant argued in his motion that the State failed to prove the following elements of the offense with which he was charged: 1) that Brenda was an adult; 2) that Brenda was unable to protect ⌊5herself from abuse; 3) that appellant was Brenda's caregiver; 4) that appellant abused Brenda; 5) that any abuse caused injury to Brenda; and 6) that Brenda sustained serious injury. The trial court ruled that, viewing the evidence in the light most favorable to the State, appellant assumed the position of caregiver to Brenda, Brenda was an impaired or endangered person, and Brenda sustained physical injury. The court agreed with appellant that the State failed to prove that any abuse resulted in serious physical injuries, so it reduced the charge from a B felony to a D felony. Following the guilt phase of the trial, the jury returned a verdict of guilty on the charge of abuse of an impaired person, D felony. In a judgment and commitment order entered May 7, 2009, the trial court sentenced appellant to seventy-two months' imprisonment in the Arkansas Department of Correction. Appellant filed a timely notice of appeal on May 19, 2009.

 Appellant argues on appeal that the trial court erred by denying his motion for a directed verdict. Motions for directed verdict and motions to dismiss are treated as challenges to the sufficiency of the evidence. *Wertz v. State*, 374 Ark. 256, 287 S.W.3d 528 (2008). The test for determining the sufficiency of the evidence is whether the verdict is supported by substantial evidence, direct or circumstantial. *Id.* Evidence is substantial if it is of sufficient force and character to compel reasonable minds to reach a conclusion and pass beyond suspicion and conjecture. *Id.* On appeal, we view the evidence in the light most favorable to the State, considering only that evidence that supports the verdict. *Id.*

⌊6Appellant was convicted of abuse of an impaired person, D felony, in violation of Arkansas Code Annotated section 5–28–103 (Repl.2006), which states in pertinent part as follows:

> (a) It is unlawful for any person or caregiver to abuse, neglect, or exploit any endangered person or impaired person subject to protection under a provision of this chapter.
>
> (b)(1) If the abuse causes serious physical injury or a substantial risk of death, any person or caregiver who purposely abuses an endangered person or an impaired person is guilty of a Class B felony.
>
> (2) If the abuse causes physical injury, any person or caregiver who purposely abuses an adult endangered person or an adult impaired person in violation of a provision of this chapter is guilty of a Class D felony.
>
> (c)(1) Any person or caregiver who neglects an adult endangered person or an adult impaired person in violation of a provision of this chapter, causing serious physical injury or substantial risk of death, is guilty of a Class D felony.
>
> (2) Any person or caregiver who neglects an adult endangered person or an adult impaired person in violation of a

provision of this chapter, causing physical injury, is guilty of a Class B misdemeanor.

(d) Any person or caregiver who abuses an adult endangered person or an adult impaired person is guilty of a Class B misdemeanor.

■■■ Appellant's first argument on appeal is that the State failed to prove that he was a caregiver of Brenda, which he contends is necessary for a conviction under section 5–28–103. In support of his argument, appellant cites our supreme court's decision in *Law v. State*, 375 Ark. 505, 292 S.W.3d 277 (2009). The State argues that appellant is misreading the holding in *Law*, and that the holding in that case does not apply here. We agree with the State. In *Law*, the supreme court did hold that the State was required to prove that the defendant in |₇that case was a caregiver in order to sustain a conviction. The key distinction between *Law* and this case is that the supreme court specifically determined that the defendant in *Law* was convicted of neglect of an impaired person under section 5–28–103(c)(1), while appellant was convicted of abuse of an impaired person under section 5–28–103(b)(2). Neglect is defined as

(A) An act or omission by an endangered person or an impaired person, for example, self-neglect; or

(B) A purposeful act or omission by a caregiver responsible for the care and supervision of an adult endangered person or an adult impaired person that constitutes negligently failing to:

(i) Provide necessary treatment, rehabilitation, care, food, clothing, shelter, supervision, or medical services to an adult endangered person or an adult impaired person;

(ii) Report a health problem or a change in a health problem or a change in the health condition of an adult endangered person or an adult impaired person to the appropriate medical personnel;

(iii) Carry out a prescribed treatment plan; or

(iv) Provide a good or service necessary to avoid physical harm, mental anguish, or mental illness as defined in regulations promulgated by the Office of Long–Term Care of the Division of Medical Services of the Department of Health and Human Services to an adult long-term care facility resident.

Ark.Code Ann. § 5–28–101(11) (Repl.2006). Therefore, only someone who is a caregiver can "neglect" an impaired person under section 5–28–103. Abuse is defined as

(A) Any purposeful and unnecessary physical act that inflicts pain on or causes injury to an endangered person or an impaired person;

(B) Any purposeful or demeaning act that a reasonable person would believe subjects an endangered person or an impaired person, regardless of age, ability to comprehend, |₈or disability, to ridicule or psychological injury in a manner likely to provoke fear or alarm;

(C) Any purposeful threat that a reasonable person would find credible and nonfrivolous to inflict pain on or cause injury to an endangered person or an impaired person except in the course of medical treatment or for justifiable cause; or

(D) With regard to any adult long-term care facility resident by a caregiver, any purposeful infliction of injury, unreasonable confinement, intimidation, or punishment with resulting physical harm, pain, or mental anguish.

Ark.Code Ann. § 5–28–101(1) (Repl.2006). The definition of abuse does not contain the requirement that the person committing the abuse be a caregiver, except if the victim is a resident in an adult long-term

care facility. Brenda was not a resident in an adult long-term care facility. Therefore, because appellant was convicted of abuse and not neglect, the supreme court's decision in *Law* does not apply. The State was not required to prove that appellant was a caregiver to Brenda.

Even if the State were required to prove appellant was a caregiver, it presented substantial evidence on that point. Caregiver is defined as "a related or unrelated person, owner, agent, high managerial agent of a public or private organization, or a public or private organization that has the responsibility for the protection, care, or custody of an adult endangered person or an adult impaired person as a result of assuming the responsibility voluntarily, by contract, through employment, or by order of the court." Ark.Code Ann. § 5–28–101(3) (Repl.2006). There was testimony that appellant lived in the same household as Brenda and that he claimed he would punish her "for her own good" because they "could not beat her," although there was evidence that she was held down and received "whuppings" with a belt and paddle. This evidence was sufficient for the jury to conclude that appellant was voluntarily acting as a caregiver for Brenda.

▮ Appellant's second argument on appeal is that the State failed to prove that he abused Brenda. However, the State produced evidence that appellant would force Brenda to stand for long periods of time, sometimes on one leg, an act Shawn Hildreth testified caused him pain. In addition, the State produced evidence that appellant assisted in the Klineses' beatings of Brenda. This was sufficient evidence for the jury to conclude that appellant committed acts that would fall under the definition of abuse.

▮ Appellant's third point on appeal is that the State failed to prove that any of his actions caused physical injury to Brenda. As noted above, Dr. Foscue testified that Brenda's extensive bruising could not have occurred in the manner she told him it did. In addition, Brenda told Dr. Foscue that appellant assisted the Klineses in beating her. In determining whether a physical injury exists, a jury may rely upon its common knowledge, experiences, and observations in life to make this determination. *Linn v. State*, 84 Ark.App. 141, 133 S.W.3d 407 (2003). The State produced sufficient evidence to allow the jury to conclude that appellant's actions resulted in physical injury to Brenda.

▮ Appellant's final argument is that the State failed to prove that he was an accomplice to any abuse of Brenda. The State contends that this argument cannot be addressed on appeal because it was not part of appellant's directed-verdict motion. However, the accomplice-liability argument is tied into appellant's overall argument in his motion that he did not cause injury to Brenda. Nevertheless, appellant does not clearly state in his argument why a determination of accomplice liability is necessary, as appellant was charged as a principal, and the jury verdict does not specify that appellant was found guilty as an accomplice as opposed to as a principal. In any event, there is no merit to this argument. There is no distinction between principals on the one hand and accomplices on the other as far as criminal liability is concerned. *Navarro v. State*, 371 Ark. 179, 264 S.W.3d 530 (2007). When two people assist one another in the commission of a crime, each is an accomplice and criminally liable for the conduct of both. *Id.* One cannot disclaim accomplice liability simply because he or she did not personally take part in every act that went to make up the crime as a whole. *Id.* As indicated above, there was testimony that appellant held Brenda down while the

Klineses beat her. The treatment of the victim by the defendants was considered to be abuse by the jury, and the evidence submitted by the State was sufficient for the jury to conclude that appellant was criminally liable for those acts, whether he was a direct participant or not.

Affirmed.

GLADWIN and GLOVER, JJ., agree.