2010 Ark. 372

**Jason TAYLOR, Appellant,**

v.

**STATE of Arkansas, Appellee.**

**No. CR 10–50.**

Supreme Court of Arkansas.

Oct. 7, 2010.

Rehearing Denied Nov. 18, 2010.

Dyer and Jones, by: F. Parker Jones III, Benton, for appellant.

Dustin McDaniel, Att'y Gen., by: Christian Harris, Ass't Att'y Gen., and Rachel M. Hurst, Ass't Att'y Gen., for appellee.

JIM GUNTER, Justice.

Appellant appeals his convictions for capital murder and kidnapping, for which he received sentences of death and life imprisonment, respectively. On appeal, he argues that the circuit court erred in (1) denying his motion for directed verdict, (2) refusing to declare Christina Head an accomplice as a matter of law and refusing to submit the issue to the jury, (3) denying his motion to quash the felony information based on the unconstitutionality of the death penalty statute, and (4) allowing prosecutorial misconduct. Because this is a criminal appeal in which the death penalty has been imposed, this court has jurisdiction pursuant to Ark. Sup. Ct. R. 1–2(a)(2). We affirm.

On October 15, 2008, several friends on a mud ride in a rural, wooded area of Saline County discovered the body of Derrick Utsey in the middle of a logging road. Detective Aaron Washington of the Saline County Sheriff's Department testified that he observed the victim's body at the crime scene. He noticed that the victim was not wearing shoes; his pockets were turned out; his shirt was pulled up to his chest; he had black electrical tape and a sock around his neck; and he had a gunshot wound to the left side of his head. Detective Washington stated that he found footprints and tire-print impressions near the body, as well as several beer cans. There was no identification, wallet, or money on the victim. Once the body had been identified, the investigation focused on who the last person was to see him. Detective Washington testified that, based on a tip from an FBI agent, he contacted David Head, the father of Christina Head, who stated that his daughter was appellant Jason Taylor's girlfriend and that she had information about the crime. Detective Washington stated that he spoke to Christina on November 6, 2008. He stated that during the meeting, she was emotional and fearful. She told the detective that she and appellant had met Utsey in the parking lot of a Little Rock motel and that appellant had given Utsey a ride. She said that several hours later, appellant contacted her and told her he had shot Utsey. She gave a description of Utsey that matched the body found in the woods. Detective Washington secured an arrest warrant for appellant based on Head's statement.

Detective Washington interviewed appellant on November 10 following his arrest. The detective testified that appellant freely and voluntarily waived his right to an attorney and that he did not appear to be under the influence of drugs or alcohol at the time of his statement. During that statement, appellant admitted that the property where the body was found was on his deer lease.

During her testimony, Christina Head identified appellant in the courtroom and stated that in October 2008, she had been his live-in girlfriend. She explained that on October 12, 2008, she stayed at the Best Value Inn on Scott Hamilton in Little Rock after she and appellant had an argument. Head produced a receipt from that motel stay, and both parties stipulated that the receipt was accurate. Head stated that while she was staying at the motel, appellant came to see her. She identified the victim, Derrick Utsey, as a man whom she saw in the parking lot of the motel prior to appellant's arrival. Later, she saw the two men talking and heard Utsey

ask for a ride. She stated that she also heard Utsey ask for drugs. She testified that she overheard Utsey tell appellant that he had $500 in his pocket. She said that appellant was driving a black truck that night that he had borrowed from Brad Carter. She stated that later, appellant and Utsey left in the truck. She said that a couple of hours later, appellant called her and asked her to gather all her stuff and come meet him. Head testified that she did so and that appellant was still in the same truck but that Brad Carter was also with him. She described appellant as "shocked" and "frightened." Utsey was no longer present. She testified that appellant made several incriminating statements to her that night after he had returned, including that he had shot the victim after Brad had beat him. Appellant stated that they had tied the man up but did not explain how he was restrained. Appellant also admitted to Head that they dumped the victim in the woods. Appellant gave her several explanations for his actions, including that he thought Utsey had robbed him, that Utsey had "screwed" him out of some money, and that he thought Utsey was "messing" with her. Appellant described how Utsey begged for his life. Appellant stated that he and Brad had burned their clothes at Buster Logan's house. Appellant also showed Head the gun he said he had used to shoot Utsey. She described the gun as an "old western looking" revolver.

Head testified that appellant wanted her to secure another motel room, so she checked into the Executive Inn in the early morning hours of October 14. Head produced a receipt for that stay as well. After checking in, she and appellant dropped the truck off at Buster Logan's house. She described how appellant cleaned out the interior of the truck. She stated that although appellant told her later that he had disposed of the gun in a

lake, he eventually admitted that he had kept the gun and it was on him when he was pulled over for speeding. She said that he admitted throwing the gun out the window of the moving vehicle.

Head explained that she had confessed to her father what she had seen and what appellant had told her, and her father convinced her to go to authorities. At the time she gave her statement to police, Head was living with appellant and his family. She stated that she was scared but in love with him. After giving her statement, she moved in with a friend. She testified that she and appellant continued to have contact after he was arrested. The two wrote many letters to each other during that time, which Head kept. The court allowed into evidence the letters appellant had written to Head during his incarceration. As to the content of the letters, appellant asked Head not to testify in court or else he will "get the death sentence," asked her not to "say something stupid to the police or [his] lawyer," mentioned the two getting married or signed the letters as her husband, told her to "fix what you said to the police," said that the reason he committed the crime was "because I love you and I thought he was fucking with you," encouraged her to blame Brad Carter for the murder, and stated that he will probably kill himself. Head stated that she felt pressured by appellant's letters. She explained that he had told her to give him an alibi if questioned by the police.

Head stated that she was asked to talk with appellant's attorney. She testified that during that interview, she and the attorney were the only people present. She explained that she and appellant's attorney went over appellant's statements and that she agreed with everything that was said because she was scared. She stated that she did not swear or take an

oath to tell the truth when she met with appellant's attorney. She testified that her statement to the defense attorney was not truthful. On cross-examination, Head stated that although her statement to appellant's attorney was notarized, she did not realize she was giving a sworn statement. Head admitted she wrote appellant several letters while he was incarcerated stating that she had lied to police about his involvement in the crime. Head claimed she wrote those things because she loved appellant and because she was scared.

Brad Carter, a codefendant in the case, testified on behalf of the State. He admitted to being a convicted felon and being incarcerated since November 2008 for the murder of Utsey. He stated he had not been promised any leniency by the State in exchange for his testimony. He stated that he had known appellant for a couple of years and had bought drugs from him. Carter admitted to using methamphetamine on October 13, 2008. In fact, he claimed to have been up for several days due to his drug use. Carter testified that he let appellant borrow a black Chevrolet S10 truck that day (that Carter had borrowed from his friend James Bennett two weeks earlier) and that appellant also asked that day to borrow a gun (that Carter had borrowed from Josh Sidney). Carter said that he first saw appellant on October 13 at Buster Logan's house, but that appellant dropped Carter off at Gus Bocksnick's home around noon that day. Appellant left in the truck, and Carter was at Gus's home for eight to ten hours. Carter explained that appellant came back to the house around midnight and picked up the gun, saying he had to go kill someone. Carter stated that he did not believe appellant at first but that when he came back a few minutes later and said he had "a nigger tied up in the back of the truck," Carter went outside. Carter observed a black man in the bed of the truck who was tied at the feet and wrists with rope. Carter testified that he had never seen the man before and did not know him but that he agreed to drive the truck. He stated that he was "anxious" and "curious." He heard the victim beg to be let go. Carter stated that appellant told the victim to "shut up" and "be quiet." Carter described how they traveled to Buster Logan's house where appellant picked up electrical tape and a sock. Appellant gagged Utsey with the sock and used the tape to secure it. Carter stated that he drove down a gravel road into the woods and that appellant removed the victim from the truck bed. Carter removed the gag from the victim's mouth, and Utsey began begging for his life and talking about his kids. Carter stated that before he could get an explanation about what was going on, appellant shot Utsey in the head. Carter testified that appellant then dragged the victim into the brush and shot him again. Carter said that appellant never spoke before or during the shooting. Carter and appellant then drove back to Logan's house to get a flashlight and blanket to hide the body before deer hunters found it. When they arrived back at the crime scene, Carter stated that appellant rolled the body into the blanket and placed it back in the bed of the truck. They drove a few miles to another wooded area and dumped the body. Carter testified that appellant burned the clothes they were wearing, along with the blanket and the bed liner. Carter stated that they then drove to the motel where Christina Head was staying and spent the night. Carter stated that after his arrest and subsequent confession, he took the police to the scene where Utsey was shot.

Dr. Frank Peretti, Associate Medical Examiner at the Arkansas State Crime Lab, testified regarding the autopsy results. Dr. Peretti described the body as

that of a twenty-eight-year-old male with two gunshot wounds to his head, one to the left forehead and one on the back left side. Both gunshot wounds were close-contact wounds, which Dr. Peretti stated meant the gun was held closely to the skin. Either gunshot wound, standing alone, would be fatal. There were no exit wounds, and the doctor recovered two bullets from the victim. Dr. Peretti explained that black electrical tape was fastened tightly around the victim's neck attached to a blood-soaked sock near his mouth. There were several abrasions on the victim's body, illustrating he had been dragged postmortem. Evidence of a contusion on the victim's left posterior thyroid gland established that he had been strangled while he was still alive. Dr. Peretti stated that although fatal, neither gunshot wound would have killed the victim instantly. Rather, death would have been imminent within a few minutes. Dr. Peretti stated that his conclusion was that the cause of death was gunshot wounds to the head with strangulation.

Arkansas State Police Officer Elvis Mull testified that on October 22, 2008, he was observing traffic on State Highway 367 near Arch Street when a white vehicle passed him driving over the posted speed limit. He initiated a traffic stop, but prior to pulling the car over, he discovered a handgun in the roadway. The driver of the speeding vehicle was cited for speeding. The passenger in the car was appellant. Officer Mull asked appellant about the handgun, and he responded that a friend had left it in the vehicle and that because he did not want to "be around it," he threw it out of the moving vehicle. Appellant admitted that it had been in his possession. Officer Mull testified that the gun was recovered after it had been run over by another vehicle and broken into pieces.

James Bennett testified that he knew Brad Carter and that the two of them had switched vehicles prior to October 2008. When Carter borrowed Bennett's black S10, it had a bed liner and tailgate. When Carter returned it, those items were missing. Additionally, the truck was covered in mud and the tires were "blown." Bennett stated that Carter explained the condition of the truck by saying that he had gone deer hunting and gotten blood in the bed of the truck.

Megan Crews testified that she was living with her boyfriend, Gus Bocksnick, in October 2008 when appellant and Carter came by the house. She stated that Carter stayed at the house for a while to sleep while appellant left. She testified that when appellant returned a few hours later to get Carter, she overheard appellant say "come on, Brad, I'm fixing to go kill this guy." Gus Bocksnick testified that he recalled appellant and Carter being at his home in October 2008. He stated that appellant left after he dropped Carter off at the house.

Robert Wayne Burnett of the Saline County Sheriff's Department testified that he assisted in the homicide investigation by securing a dark-colored Chevrolet S10 pickup truck from James Bennett after being informed the truck might have been used during the commission of the crime. The truck was missing its tailgate and bed liner. Bobby Humphries, latent-print examiner with the state crime lab, testified that he evaluated the tire impression from the scene and the tires on the Chevy S10 and concluded that the S10 could have made the impression found at the scene. Although he could not exclude all other tires, the rear-left tire on the S10 had a defect that caused a significant pattern that was visible in the impression.

Steve Hargis, firearms examiner with the state crime lab, testified that the gun

that was recovered from Officer Mull was so damaged that it could not be test fired and that the complete serial number could not be obtained. Hargis stated that the bullets recovered from the victim were both fired from a gun barrel that had been manufactured with six lands and six grooves with a right twist. Hargis explained that gun manufacturers cut grooves into the barrel of a firearm so that it could perform properly. Although unable to test fire the firearm in this case, Hargis was able to compare the grooves on the bullets and the grooves on the firearm and determined that the grooves in the bullets recovered from the victim were consistent with the grooves cut into the barrel of the firearm recovered by Officer Mull. However, Hargis stated he could not state with certainty that those bullets were fired from that gun because the groove pattern was a common pattern used by multiple manufacturers for .22–caliber pistols.

Forensic investigators from the state crime lab testified that transfer DNA in the form of skin cells were found on the barrel of the .22 revolver recovered by Officer Mull that matched appellant within all scientific certainty; that Carter and the victim were excluded as contributors of the DNA profile found on the gun; and that DNA in the form of blood found on the bumper of the S10 truck matched the victim within all scientific certainty. The forensic examiner testified that the term "within all scientific certainty" meant the results were greater than one in three hundred billion.

The case was submitted to the jury, which found appellant guilty of capital murder and kidnapping but rejected the aggravated-robbery charge. The jury sentenced appellant to death by lethal injection on the capital-murder conviction and life imprisonment on the kidnapping conviction.

## I. Sufficiency of the Evidence

For his first point on appeal, appellant asserts that the circuit court erred in denying his motions for directed verdict on both the charge of capital murder and kidnapping. Specifically, appellant contends that the State failed to sufficiently prove that appellant interfered substantially with the victim's liberty or used force to restrain the victim to sustain a conviction for kidnapping and that the State failed to provide sufficient evidence of premeditation and deliberation to support the capital-murder charge. Appellant asserts that the State relied on the uncorroborated testimony of the codefendant, Bradley Carter, who appellant maintains was not credible.

This court treats a motion for directed verdict as a challenge to the sufficiency of the evidence. *Tubbs v. State*, 370 Ark. 47, 257 S.W.3d 47 (2007). In reviewing a challenge to the sufficiency of the evidence, this court determines whether the verdict is supported by substantial evidence, direct or circumstantial. *Id.* Substantial evidence is evidence forceful enough to compel a conclusion one way or the other beyond suspicion or conjecture. *Id.* This court views the evidence in the light most favorable to the verdict, and only evidence supporting the verdict will be considered. *Id.*

Although circumstantial evidence may provide a basis to support a conviction, it must be consistent with the defendant's guilt and inconsistent with any other reasonable conclusion. *Morgan v. State*, 2009 Ark. 257, 308 S.W.3d 147. Whether the evidence excludes every other hypothesis is left to the jury to decide. *Id.* The credibility of witnesses is an issue for the jury and not the court. *Id.* The trier of fact is free to believe all or part of any

witness's testimony and may resolve questions of conflicting testimony and inconsistent evidence. *Id.*

When accomplice testimony is considered in reaching a verdict, Arkansas law provides that a person cannot be convicted based upon the testimony of an accomplice "unless corroborated by other evidence tending to connect the defendant ... with the commission of the offense." Ark.Code Ann. § 16–89–111(e)(1)(A) (Repl. 2005). Furthermore, "corroboration is not sufficient if it merely shows that the offense was committed and the circumstances thereof." Ark.Code Ann. § 16–89–111(e)(1)(B) (Repl.2005). Corroborating evidence need not establish each element of an offense or corroborate every detail of the accomplice testimony. *MacKool v. State,* 365 Ark. 416, 231 S.W.3d 676 (2006). It must be evidence of a substantive nature since it must be directed toward proving the connection of the accused with a crime and not toward corroborating the accomplice testimony. *Stephenson v. State,* 373 Ark. 134, 282 S.W.3d 772 (2008). The corroborating evidence need not be sufficient standing alone to sustain the conviction, but it must, independent from that of the accomplice, tend to connect to a substantial degree the accused with the commission of the crime. *Id.* The test is whether, if the testimony of the accomplice were completely eliminated from the case, the other evidence independently establishes the crime and tends to connect the accused with its commission. *Id.*

It is well settled that the acts, conduct, and declarations of the accused, before or after the crime, may furnish necessary corroboration. *MacKool,* 365 Ark. at 433, 231 S.W.3d at 690–91. Moreover, we have held that a family member's testimony that he or she was asked to lie about an appellant's whereabouts during the commission of a crime is sufficient to connect the appellant to the crimes as well as corroborate an accomplice's testimony. *Stephenson,* 373 Ark. at 139, 282 S.W.3d at 777. We have further held that the jury is not required to lay aside its common sense in evaluating the ordinary affairs of life. *Id.*

Appellant first argues that the State failed to present sufficient evidence to support the jury's finding that appellant committed the felony of kidnapping. A person commits kidnapping if, without consent, he restrains another person so as to interfere substantially with the other person's liberty with the purpose of facilitating the commission of any felony; facilitating flight after the commission of any felony; inflicting physical injury upon the other person; or terrorizing the other person. Ark.Code Ann. § 5–11–102 (Repl. 2006).

While it is true that the State relied heavily on the codefendant's testimony—who testified that he saw the victim bound with rope in the bed of the truck—to support the kidnapping charge, we are satisfied that the State provided sufficient corroborating evidence to support Carter's testimony. Appellant's girlfriend, Christina Head, testified that the appellant admitted to her that he had tied up the victim. Additionally, the victim was found with black electrical tape wound around his neck attached to a sock that had been used as a gag, and the medical examiner testified that the victim had been strangled and gagged before his death. The testimony of both Megan Crews and Gus Bocksnick was consistent with Carter's testimony that appellant had dropped him at Bocksnick's home, left, and returned later. Megan also overheard appellant say that he was going to kill "this guy," which further substantiated Carter's same testimony. Moreover, blood was found on the bumper of the truck appellant was driving that night and, when returned to its owner,

the truck was missing its bed liner. Taken together, these facts support Carter's testimony that the victim was restrained in the bed of the truck. Additionally, Head testified that appellant asked her to lie about the events of the night in question, provide him an alibi, and to implicate Carter. Letters appellant wrote to Head while he was incarcerated illustrate that he was pressuring Head regarding her statements to police. Appellant's conduct and declarations after the crime are indicative of his guilt and can be used for corroborating the testimony of the accomplice. We affirm appellant's kidnapping conviction because there is sufficient evidence to corroborate Carter's testimony that appellant restrained the victim to the point of interfering with his liberty.

■■■■■ Appellant also argues that the State failed to prove sufficient evidence of premeditation and deliberation to support the capital-murder conviction. The State submitted to the jury two theories on which it could find appellant committed capital murder—felony murder and premeditated and deliberated murder. With regard to felony murder, a person commits capital murder if, acting alone or with another person, he commits or attempts to commit kidnapping, and in the course of and in furtherance of the kidnapping or in immediate flight therefrom, he or an accomplice causes the death of any person under circumstances manifesting extreme indifference to the value of human life. Ark.Code Ann. § 5–10–101(a)(1) (Repl. 2006). In addition, a person commits capital murder if, with the premeditated and deliberated purpose of causing the death of another person, he causes the death of any person. Ark.Code Ann. § 5–10–101(a)(4) (Repl.2006). Premeditation and deliberation may be formed in an instant. *Marcyniuk v. State,* 2010 Ark. 257, 373 S.W.3d 243. Intent can rarely be proven

by direct evidence; however, a jury can infer premeditation and deliberation from circumstantial evidence, such as the type and character of the weapon used; the nature, extent, and location of wounds inflicted; and the conduct of the accused. *Id.*

■■■■ Because the capital-murder charge was submitted to the jury as a general verdict, the jury did not specify if it had found upon the basis of felony murder, premeditated and deliberated murder, or both. Moreover, appellant fails in his brief to challenge the sufficiency of the capital-murder conviction on the basis of felony murder. However, we will affirm a general verdict without regard to the State's proof on a particular element of a charge if there is sufficient evidence to convict on the alternative ground. *Williams v. State,* 347 Ark. 728, 67 S.W.3d 548 (2002). Thus, we may affirm the capital-murder conviction if there was sufficient evidence to prove appellant, with premeditation and deliberation, caused the death of the victim.

Sufficient evidence supports the jury's verdict on premeditated and deliberated capital murder. The majority of evidence to prove premeditation and deliberation is provided via accomplice testimony from Carter, but that testimony is corroborated by forensic evidence and testimony from other witnesses. The State established that appellant borrowed a truck from Carter on October 13, 2008, then dropped Carter off at Gus Bocksnick's house for several hours. Appellant went to the motel where his girlfriend, Christina Head, was staying and encountered the victim in the parking lot. Head testified that appellant and the victim left the motel in order to purchase drugs. Appellant returned to Bocksnick's house and borrowed a gun from Carter. Carter and Megan Crews heard appellant say he was going to kill

someone. Appellant returned fifteen minutes later and picked up Carter, who saw the victim bound in the bed of the truck. Carter and appellant drove to Buster Logan's house, where the appellant picked up black electrical tape. Using the tape and a sock, appellant gagged the victim. Carter and appellant then drove approximately ten miles away to a wooded location. Carter testified that appellant held a gun on the victim during the drive. Once they arrived, appellant shot the victim twice in the head as he begged for his life. The two left the victim in the woods, and they drove back to Logan's house, where appellant obtained a flashlight and blanket. Returning to the murder site, appellant and Carter moved the body to another remote, wooded location. Next, they burned their clothes. Appellant then picked up his girlfriend, admitted to her that he had shot the victim, and moved to another motel. Head testified that she saw appellant cleaning out the truck. The truck was later returned missing a bed liner and the tailgate. Head testified that appellant asked her to provide him an alibi for the night of the incident and to implicate Carter as the shooter. Appellant wrote letters to Head while he was incarcerated where he encouraged her to "fix" what she told police.

Forensic evidence corroborates much of Carter's testimony—the victim was found in a remote, wooded area with two gunshot wounds to his head and black electrical tape with a sock was wrapped around his neck. The victim's blood was found on the bumper of the truck appellant was driving that night. Furthermore, appellant's DNA was found on a gun that could have fired the bullets recovered from the victim. Additionally, testimonial evidence supports the finding of premeditation and deliberation. Megan Crews corroborated that appellant stated he needed a gun to shoot someone. Head testified that appellant told her he shot the victim and showed her the gun he had used. Her description of the murder weapon was consistent with the gun that was recovered. Taken as a whole, the evidence is sufficient to prove appellant, with premeditation and deliberation, caused the death of the victim.

## II. *Co–Accomplice Liability*

Appellant's third argument on appeal is that the circuit court erred in refusing to declare appellant's girlfriend as an accomplice and in refusing to instruct the jury that it could find she was an accomplice so that her testimony would require corroboration.

For an individual to be an accomplice, he must engage in one of the activities articulated in Ark.Code Ann. § 5–2–403 (Repl.2006):

(a) A person is an accomplice of another person in the commission of an offense if, with the purpose of promoting or facilitating the commission of an offense, the person:

(1) Solicits, advises, encourages, or coerces the other person to commit the offense;

(2) Aids, agrees to aid, or attempts to aid the other person in planning or committing the offense; or

(3) Having a legal duty to prevent the commission of the offense, fails to make a proper effort to prevent the commission of the offense.

(b) When causing a particular result is an element of an offense, a person is an accomplice of another person in the commission of that offense if, acting with respect to that particular result with the kind of culpable mental state sufficient for the commission of the offense, the person:

(1) Solicits, advises, encourages, or coerces the other person to engage in the conduct causing the particular result;

(2) Aids, agrees to aid, or attempts to aid the other person in planning or engaging in the conduct causing the particular result; or

(3) Having a legal duty to prevent the conduct causing the particular result, fails to make a proper effort to prevent the conduct causing the particular result.

Mere presence at the crime scene or failure to inform law enforcement officers of a crime does not make one an accomplice as a matter of law. *Cook v. State*, 350 Ark. 398, 86 S.W.3d 916 (2002). Relevant factors in determining the connection of an accomplice to a crime are the presence of the accused in proximity to the crime, the opportunity to commit the crime, and an association with a person involved in the crime in a manner suggestive of joint participation. *Raynor v. State*, 343 Ark. 575, 36 S.W.3d 315 (2001).

The appellant bears the burden of proving that a witness is an accomplice whose testimony must be corroborated. *Cook, supra.* A defendant must either have the circuit court declare a witness to be an accomplice as a matter of law or submit the issue to the jury for determination. *Price v. State*, 365 Ark. 25, 223 S.W.3d 817 (2006). The law is well settled that a witness's status as an accomplice is a mixed question of law and fact. *McGehee v. State*, 348 Ark. 395, 72 S.W.3d 867 (2002). However, when the facts show conclusively that the witness is an accomplice, the issue may be decided as a matter of law. *Id.* When the accomplice status instead presents issues of facts, the question is submitted to the jury. *Id.* An instruction should only be excluded when there is no rational basis for giving it. *Grillot v. State*, 353 Ark. 294, 107 S.W.3d 136 (2003). A circuit court's ruling on whether to submit a jury instruction will not be reversed absent an abuse of discretion. *Id.*

We affirm on this point because the circuit court did not abuse its discretion in determining there was no rational basis for finding Christina Head was an accomplice. No facts were presented that she solicited, advised, encouraged, or coerced appellant to kidnap or murder the victim. There was no evidence that she aided or agreed to aid him in the planning or commission of the crime. In fact, there is no evidence to support that she knew about the crime until after it had been committed. No testimony or evidence suggests Head was at the crime scene. All incriminating actions by Head occurred after the crime was committed, such as assisting the appellant in moving to a different hotel and being present when he cleaned out the truck. At most, her actions establish that she was an accessory after the fact and possibly hindered the apprehension and prosecution of appellant. There is no evidence to support a finding of accomplice liability. Therefore, the circuit court did not abuse its discretion in refusing to find Head was an accomplice and in refusing to instruct the jury that it could do so.

## III. *Constitutionality of the Death Penalty*

Appellant's next argument is that the circuit court erred by denying his pretrial motion to quash the criminal information, resulting in a violation of appellant's fourth, fifth, sixth, eighth, and fourteenth amendment rights. Specifically, he contends that the death penalty is, per se and as applied to him, cruel, unusual, and excessive punishment; that our state statutory capital-punishment scheme is overly broad, vague, and allows for an arbitrary

and capricious imposition of death; and that our state statutory capital-punishment scheme is unconstitutional because it requires a mandatory imposition of death and lacks sufficient constitutionally required standards.

Appellant's assertions under this point are mostly public-policy arguments against the death penalty, and he cites only one Arkansas case in support of his contentions. This court need not address an argument unsupported by citation to authority or convincing argument, and we could reject this argument for this reason alone. *See Harrison v. State,* 371 Ark. 652, 269 S.W.3d 321 (2007). However, as to the merits of appellant's argument that the death penalty violates the Eighth Amendment's prohibition against cruel and unusual punishment, we have upheld the death penalty against this same argument many times. *See Newman v. State,* 353 Ark. 258, 106 S.W.3d 438 (2003); *Echols v. State,* 326 Ark. 917, 936 S.W.2d 509 (1996); *Fairchild v. State,* 284 Ark. 289, 681 S.W.2d 380 (1984). Appellant has provided no basis to reverse our precedent on this point.

Appellant also argues on appeal that the death penalty is unconstitutional as applied to his specific case. However, he failed to preserve this argument for our review. His motions to quash did not cover his "as applied" argument (those motions were filed before trial and the facts against him had not yet been established), and he failed to make a motion to that effect after the State rested or before the case was submitted to the jury. Rather, his directed-verdict motions focused on the sufficiency of the evidence. We do not address arguments raised for the first time on appeal. Even constitutional arguments are waived on appeal when not raised below. *Springs v. State,* 368 Ark. 256, 244 S.W.3d 683 (2006). Furthermore, appellant again fails to cite one Arkansas case on point or provide any convincing argument to persuade this court. Therefore, we reject his arguments for failure to provide convincing argument or citation to authority as well. *See Harrison, supra.*[1]

Appellant's final constitutional argument focuses on our state statutes regarding the implementation of the death penalty. None of his arguments have merit as all the contentions he makes have been addressed and rejected in prior cases, including: that our death-penalty statutes are not unconstitutional for lack of comparative proportionality, *Williams v. State,* 321 Ark. 344, 902 S.W.2d 767 (1995); are not void for vagueness, are not overly broad, and do not unconstitutionally overlap the first-degree murder statute, *Echols,* 326 Ark. at 982–84, 936 S.W.2d at 543–44; and

---

1. Mindful of our obligation under Rule 10 of the Arkansas Rules of Appellate Procedure–Criminal, however, we note that there is no merit to appellant's contention. The jury here was instructed on the elements of capital murder and the appropriate aggravators and mitigators in applying the death penalty. Where there is substantial evidence to support the jury's finding of guilty on capital murder and one or more statutory aggravators have been proven beyond a reasonable doubt, we have held the imposition of the death penalty is not unconstitutional. *See Echols,* 326 Ark. at 987–88, 936 S.W.2d at 545–46. Appellant does not challenge the accuracy of the jury instructions in this case, and as explained in more detail earlier on his sufficiency point, there was substantial evidence to support his capital-murder conviction. Neither does appellant argue that there was insufficient evidence to support the jury's finding of the statutory aggravator in this case—that the murder was committed in an especially cruel or depraved manner. That finding is supported by the evidence that the victim was bound, strangled, gagged, and driven down a dirt road into the woods where he was shot once at close range, dragged several feet, and then shot again at close range, the entire time pleading for his life.

our capital-murder sentencing statutes do not impose a mandatory death sentence because the jury is allowed to sentence the defendant to life imprisonment without parole, *Nooner v. State*, 322 Ark. 87, 907 S.W.2d 677 (1995).

## IV. *Prosecutorial Misconduct*

■ Appellant's final point on appeal is that the prosecutor in his case "took improper actions that both rendered [a]ppellant's trial and sentencing fundamentally unfair and substantially risked arbitrary infliction of the death penalty." In support of this contention, appellant claims the State was allowed to "continually" lead its witnesses, make improper statements during closing, and mislead the jury as to whether a plea bargain was imminent for the codefendant. For the following reasons, appellant's argument is not persuasive.

■ First, for a cumulative-error argument with regard to prosecutorial misconduct to be upheld on appeal, the appellant must show that there were objections to the alleged errors individually and that a cumulative-error objection was made to the circuit court and a ruling obtained. *Brown v. State*, 368 Ark. 344, 246 S.W.3d 414 (2007). No such ruling was made here, and we can decline to address appellant's argument on that basis. *Id.*

Nevertheless, as to the leading questions, appellant concedes in his brief that he oft objected to the State leading its witnesses and that the circuit court sustained those objections. Appellant maintains that the circuit court should have, upon its own motion, recognized the excessive leading by the State and granted a mistrial. This appears to be a *Wicks*—type argument, for which appellant has provided no basis. *See Wicks v. State*, 270 Ark. 781, 606 S.W.2d 366 (1980). Appellant never moved for a mistrial on this basis, and his argument does not fall within any of the enumerated exceptions under *Wicks;* therefore, this argument is not preserved for our review.

■ Appellant also argues that statements made by the prosecutor during closing, in regard to lesser-included offenses and appellant's inconsistent explanations, rose to the level of prosecutorial misconduct. Specifically, he maintains that the prosecutor improperly commented on his defense of general denial and his decision not to testify. However, appellant failed to object on this basis at trial. Early in the State's closing argument, appellant's counsel objected without specifying his basis. Instead, his counsel said "I don't think I said that." The court reminded the jury it was instructed that remarks by attorneys are not evidence. After that, appellant's counsel never again objected during the prosecutor's closing. It is appellant's responsibility to obtain a clear ruling from the court, and we do not consider issues where the appellant has failed to do so. *Burton v. State*, 327 Ark. 65, 937 S.W.2d 634 (1997). Without a specific, contemporaneous objection, this point is not preserved for review.

■ On the merits, however, appellant's argument still fails. We have made it clear that a mistrial is a drastic remedy that should only be granted when justice cannot be served by continuing at trial, or when the error cannot be cured by an instruction or admonishment. *Jackson v. State*, 368 Ark. 610, 249 S.W.3d 127 (2007). We have also explained that "some leeway is given to counsel in closing argument and that counsel are free to argue every plausible inference which can be drawn from the testimony." *Newman v. State*, 353 Ark. 258, 290, 106 S.W.3d 438, 459 (2003). Therefore, a trial court is given broad discretion in controlling the argu-

ments of counsel, such that, absent an abuse of that discretion, the trial court's decision will not be disturbed on appeal. *Jackson,* 368 Ark. at 615–16, 249 S.W.3d at 130. The prosecutor's comments during closing regarding inconsistent statements given by appellant were related to evidence before the jury, including the various inconsistent explanations appellant gave to police and his girlfriend regarding what happened on the night in question. Moreover, the prosecutor's comments with regard to the lesser-included offenses occurred during rebuttal after the defense had asked the jury to convict on a lesser offense even though the defense had also argued that appellant's defense was that he had nothing to do with the crime. The prosecutor noted that appellant's defense was general denial, and that if the jury believed him, then it could not convict on any of the charges. We are not convinced that any misconduct here rose to the level to require the circuit court to sua sponte grant a mistrial.

For his final prosecutorial-misconduct argument, appellant maintains that the State failed to inform the jury that the codefendant, Carter, would receive a favorable plea bargain in exchange for his testimony against appellant. At the time of appellant's trial, Carter did not have a plea arrangement with the State. Everything he said could have been used against him. Appellant provides no citation to authority to support his argument that the State had any duty in this regard or that the circuit court erred in any way. This court need not address an argument unsupported by citation to authority or convincing argument, and we reject this argument for this reason alone. *See Harrison, supra.*

## V. *Rule 4–3(i) & Rule 10 Compliance*

The record in this case has been reviewed pursuant to Rule 4–3(i) of the Rules of the Arkansas Supreme Court, Ark.Code Ann. § 16–91–113(a), and Rule 10 of the Rules of Appellate Procedure–Criminal as required by law, and no reversible error has been found. We have considered each of the factors enumerated in Rule 10 and found no error.

Affirmed.

DANIELSON, J., concurs in part; dissents in part.

DANIELSON, J., concurring in part, dissenting in part.

While I too would affirm Taylor's conviction for capital murder and his sentence to death, I would reverse his conviction for kidnapping because I believe there was insufficient evidence to sustain the conviction. Accordingly, I respectfully concur in part and dissent in part.

A person commits the offense of kidnapping if, without consent

the person restrains another person so as to interfere substantially with the other person's liberty with the purpose of:

(1) Holding the other person for:

(A) Ransom or reward; or

(B) Any other act to be performed or not performed for the other person's return or release;

(2) Using the other person as a shield or hostage;

(3) Facilitating the commission of any felony or flight after the felony;

(4) Inflicting physical injury upon the other person;

(5) Engaging in sexual intercourse, deviate sexual activity, or sexual contact with the other person;

(6) Terrorizing the other person or another person; or

(7) Interfering with the performance of any governmental or political function.

Ark.Code Ann. § 5–11–102(a) (Repl.2006). Here, Carter testified that he saw Utsey tied up in the back of the borrowed truck, and normally, such testimony might constitute substantial evidence. The problem, here, however, is that Carter was an accomplice to Taylor.

We have held that a felony conviction cannot be had upon the testimony of an accomplice unless corroborated by other evidence tending to connect the defendant with the commission of the offense. *See* Ark.Code Ann. § 16–89–111(e)(1) (Repl. 2005). Corroboration is not sufficient if it merely shows that the offense was committed and the circumstances thereof. *See id.; Wertz v. State,* 374 Ark. 256, 287 S.W.3d 528 (2008). Corroborating evidence must be evidence of a substantive nature since it must be directed toward proving the connection of the accused with a crime and not directed toward corroborating the accomplice's testimony. *See Wertz,* 374 Ark. 256, 287 S.W.3d 528. It need not be sufficient standing alone to sustain the conviction, but it must, independent from that of the accomplice, tend to connect to a substantial degree the accused with the commission of the crime. *See id.* The test for corroborating evidence is whether, if the testimony of the accomplice were completely eliminated from the case, the other evidence independently establishes the crime and tends to connect the accused with its commission. *See id.* While corroborating evidence may be circumstantial so long as it is substantial, evidence that merely raises a suspicion of guilt is insufficient to corroborate an accomplice's testimony. *See id.*

As noted by the majority, Head testified that Taylor told her that he had tied Utsey up and shot him. That is the only testimony other than Carter's specifically referencing a kidnapping, and it is my opinion that Head's testimony simply fails to meet the test for corroborating evidence. To constitute kidnapping, Taylor had to restrain Utsey so as to interfere substantially with his liberty. Here, there was no physical evidence demonstrating restraint.[1] Instead, the only evidence even remotely establishing that a kidnapping occurred was the eyewitness account by an accomplice and a statement by a witness that Taylor told her he had tied Utsey up. In my mind, such evidence simply does not rise to the level of being substantial for purposes of corroboration.

That being said, even while I would reverse Taylor's conviction for kidnapping, which would also require reversal of his capital-felony murder conviction,[2] it is

1. Despite the majority's citation to the electrical tape around Utsey's neck, tape around one's neck is in no way a restraint of one's liberty. Moreover, the remaining evidence cited by the majority simply makes clear that there was sufficient evidence to sustain Taylor's conviction for premeditated and deliberated capital murder. Accepting the majority's citation of evidence in support of kidnapping, each and every capital murder would necessarily include a kidnapping. That is not the law in Arkansas.

2. Again, Taylor was convicted of capital murder; however, the jury's verdict was a general

one. While the jury was instructed on both capital-felony murder and premeditated and deliberated capital murder, the verdict form fails to indicate under which provision Taylor was found guilty. Arkansas Code Annotated § 5–1–101(a)(1) (Repl.2006) sets forth the requirements for capital-felony murder and provides:

(a) A person commits capital murder if:
(1) Acting alone or with one (1) or more other persons:
(A) The person commits or attempts to commit:
(i) Terrorism, as defined in § 5–54–205;
(ii) Rape, § 5–14–103;

clear that there was ₂₇substantial evidence to sustain Taylor's conviction for premeditated and deliberated capital murder.

For these reasons, I respectfully concur in part and dissent in part.

(iii) Kidnapping, § 5–11–102;

(iv) Vehicular piracy, § 5–11–105;

(v) Robbery, § 5–12–102;

(iv) Aggravated robbery, § 5–12–103;

(vii) Residential burglary, § 5–39–201(a);

(viii) Commercial burglary, § 5–39–201(b);

(ix) Aggravated residential burglary, § 5–39–204;

(x) A felony violation of the Uniform Controlled Substances Act, §§ 5–64–101—5–64–508, involving an actual delivery of a controlled substance; or

(xi) First degree escape, § 5–54–110; and

(B) In the course of and in furtherance of the felony or in immediate flight from the felony, the person or an accomplice causes the death of a person under circumstances manifesting extreme indifference to the value of human life.

Without a conviction for kidnapping, and where Taylor was acquitted of aggravated robbery, it would seem that Taylor's conviction for capital murder, if based on subsection (a)(1), would also have to be reversed.