2011 Ark. 450

**Kevin DIXON, Appellant**

v.

**STATE of Arkansas, Appellee.**

**No. CR 10–1223.**

Supreme Court of Arkansas.

Oct. 27, 2011.

Harrelson & Matteson, P.A., by: Jeff Harrelson, Texarkana, for appellant.

Dustin McDaniel, Att'y Gen., by: Brad Newman, Ass't Att'y Gen., for appellee.

KAREN R. BAKER, Justice.

Appellant Kevin Dixon was convicted by a Miller County jury of capital-felony murder, with aggravated robbery as the underlying felony, of Jose Vargas in Texarkana, Arkansas, and sentenced to life imprisonment without the possibility of parole. On appeal, he argues that the circuit court abused its discretion by (1) admitting evidence of his drug activity, (2) admitting hearsay, (3) admitting autopsy photographs, and (4) refusing to grant a mistrial. He also asserts that there was insufficient evidence to convict him of capital-felony murder.[1] Because this is a criminal appeal in which life imprisonment has been imposed, this court has jurisdiction pursuant to Arkansas Supreme Court Rule 1–2(a)(2) (2011). We affirm.

On June 15, 2009, at approximately 5:00 a.m., Roland Hayes was walking on Prince Street in Texarkana, Arkansas, and discovered a body, later identified as Jose Vargas, lying on the street. Although he did not touch the person, he observed that Vargas had a $20 bill clutched in one hand. Hayes contacted the police, and the Texarkana, Arkansas Police Department ("department"), including Officer Lloyd Douglas, Detective Bobby Jordan, Detective Les Moody, and Detective Paul Nall, responded to the scene. Unable to rouse Vargas, the officers contacted Lifenet who determined that Vargas was dead.

Douglas noticed that Vargas had scratches on his arms, legs, and head, and that he had a patch of hair missing. Douglas also observed that the pockets to Vargas's shorts were turned inside out, a condition commonly referred to as "rabbit ears" or "bunny ears," that one of his shoes was in the middle of the street approximately two houses from the body, and that he had cash clutched in one hand. To exclude Hayes as a suspect, Douglas patted him for weapons and found none, nor did he find anything to suggest that Hayes had been involved in a struggle. He noticed that Hayes's wallet did not contain a large amount of cash.

Supervising Detective Bobby Jordan determined that the extent of Vargas's injuries to his head, chin, arm, and leg was inconsistent with the officers' initial theory that Vargas was run over by a vehicle. Jordan's belief was confirmed when he saw that Vargas's t-shirt was "wet and soaked" and that a .22 shell casing was found under his right arm when his body was rolled over. A cellular phone was recovered from Vargas's pocket, and a review of the call history reflected that four calls had been made to phone number 490–8035, including the last call made from the phone.

At the scene, Detective Moody dialed 490–8035 using Vargas's cellular phone but did not get an answer. Moody then dialed the previous number reflected in the call history and a woman, later identified as Rosalie Vargas, answered. During the conversation, she stated that her husband did not come home the night before. Detective Moody then went to the home of Rosalie Vargas and showed her the phone found on the body of the victim, and she identified it as belonging to her husband, Jose Vargas. She showed him Vargas's Texas driver's license, permitting the police to officially identify the body.

---

1. Dixon was charged in the criminal information with one count of capital murder. The information alleged two alternative theories: (1) felony murder, with the underlying felony being aggravated robbery; or (2) premeditated murder. The jury convicted Dixon of capital-felony murder.

That same day, the police investigation revealed that the phone number 490–8035 was registered to Dixon, and Detectives Moody and Nall went to the home where Dixon was living, which was approximately nine blocks from where Vargas's body was found. Dixon and his girlfriend, Kizzie Cox, were there and the officers explained that they were investigating a death. Dixon agreed to go to the police department for questioning. He admitted that he had been involved in the selling of marijuana on June 14 and 15, 2009. Dixon said that he once had a cellular phone that had the number 490–8035; however, he said that it had been lost two months previously. Dixon stated that he had another cellular phone that had a different number. When questioned about an alibi for the evening of Vargas's murder, Dixon told the officers that he was at a friend's house until Cox picked him up, and they drove home after midnight on Sunday morning.

The police subpoenaed the records for phone number 490–8035. The records showed that the phone number for Dixon's new phone had been contacted from the phone number for the phone he claimed to have lost two months earlier. When Nall asked for an explanation, Dixon stated that whoever had his old phone had been harassing him by calling him at his new phone number, but he could not explain how that person would know his new phone number. Dixon denied knowing the victim and had no explanation why Vargas had called his old cellular number in the hours preceding his death. Another number reflected in the records belonged to Felicia Robertson,[2] who told police that Dixon was a friend and co-worker and that she had talked with him several times on June 14 and 15, 2009, and on all of those occasions, Dixon had been using the cellu-

lar phone that he claimed to have lost. When Nall confronted Dixon with this information, Dixon offered no explanation.

At trial, Robertson testified and verified what she had told the police during their investigation. She stated that Dixon called her on June 15 and admitted that he had lied to her previously when he stated that he had spent the prior night at his sister's house. She said that Dixon also admitted to her that he had lied to the police when he told them that he did not know Vargas.

Kizzie Cox testified and reiterated that she told the police that she talked on the phone to Dixon on June 14, and her cellular phone display reflected that the telephone number he was calling from was the phone he later claimed to have lost. Cox testified that she picked up Dixon on the night of June 14, and they went home around midnight and she played dominoes with her father for about twenty minutes. Afterward, she and Dixon talked and watched television for a while before she fell asleep, and she did not awaken until 7:00 a.m. the next morning. Cox also testified that Dixon drove her red Tahoe whenever he needed it.

Rosalie Vargas testified that she informed the detectives from the department that a few weeks before the shooting she saw someone in a red Suburban place something in their mailbox, but she did not see her husband retrieve it. She said that her husband admitted only a week before the shooting that he was buying marijuana; however, she was unaware that he was using cocaine. She testified that her husband kept a lot of money at their home because they were saving money to purchase a home. By her estimation, they had $15,000 the week before Vargas's

---

**2.** Dixon spells her name as Felecia Robertson, and the State refers to her as Felicia Robert-son. We refer to her as Felicia Robertson as this is the spelling in the record.

death. Rosalie testified that after Vargas's death, she went to get money for the funeral and noticed that there was less money, although she could not state exactly how much was missing. Department Detective Angel Guzman testified that on June 16, Rosalie told him that Vargas's wallet was at their home and that approximately $3000 was missing.

William Newton was employed at Orr Auto Group, where Vargas worked. He testified that Vargas was paid approximately $2500 by his employer near the time of his death. Uriel Cortes testified that he also knew Vargas from work and was aware that he used drugs. Cortes stated that on June 14, he and Vargas were together with some other people at a house approximately two blocks from Vargas's home. They were drinking, and Cortes departed around 10:30 p.m. and never saw Vargas again.

Torin Smith was incarcerated with Dixon at the Miller County jail and shared the same pod. Smith testified that Dixon explained to Smith that he was jailed on a capital-murder charge but that he did not believe that he would be convicted because the police did not have any evidence. Smith stated that Dixon informed him that he sold drugs to Vargas. According to Smith, Dixon explained that normally he placed the drugs in Vargas's mailbox and picked up the money from the mailbox. Dixon told Smith that he had a friend who was selling drugs to a "Mexican guy" who had a lot of money. Dixon's friend did not want to rob Vargas, so he sought the assistance of Dixon. Smith testified that Dixon admitted that he picked up Vargas, and when he pulled out $2900, Dixon robbed him. Dixon stated that he pushed Vargas out on the side of the road, leaving him with "rabbit ears." Dixon told Smith that he killed Vargas to prevent him from identifying Dixon.

Smith testified that Dixon also told him that he had talked to Vargas on his cellular phone, but stated that when the police asked him about that specific phone, he denied having it and gave them a different phone, which had another number. Dixon expressed disappointment that his girlfriend told the police that when she went to sleep on the night of the murder, Dixon was awake. Instead, Dixon said to Smith that he wished she had told the police that he went to sleep before she did. Dixon told Smith that he had thrown the gun used to kill Vargas into the lake at Spring Lake Park and that the police would never find it. Smith testified that he reported to officers at the department what Dixon had told him concerning the murder. Detective Moody testified that the information furnished by Smith regarding what Dixon had stated could only have been known by someone who was involved in the murder of Vargas.

Detectives Moody and Nall testified about events of the department's investigation into Vargas's death. Moody testified that the investigation revealed that Vargas spent most of the day before he was murdered buying beer and drugs. He stated that when Dixon was arrested and booked into jail on June 18, 2009, he had $2900 on his person. Nall also testified that on June 15, he observed a red or maroon Tahoe at Dixon's residence and that during the investigation a witness reported that a red Tahoe appeared occasionally at Vargas's home. Nall stated that the witness reported that Vargas got into the Tahoe whenever it appeared at his home and that the driver of the vehicle sold narcotics to Vargas.

Stephen Nichols of the Texas Department of Public Safety's Dive Recovery Team conducted a dive search of the lake at Spring Lake Park, and he testified that he found a .22–caliber revolver. Rebecca

Mullen of the Arkansas State Crime Laboratory analyzed the bullet from Vargas's body and the .22 recovered from the lake; however, because the bullet from Vargas's body was damaged, she testified that she could not make a match. She did verify that the bullet removed from Vargas's body was a .22 caliber.

Deputy Chief Medical Examiner Stephen Erickson testified that Vargas died as a result of a gunshot wound to the chest. Dr. Erickson noted that the abrasions on Vargas's body were not consistent with someone collapsing unconscious to his knees. Rather, they were consistent with someone skidding across a hard, abrasive surface for some distance. Dr. Erickson's autopsy report revealed the presence of cocaine and alcohol in Vargas's system.

Verizon Wireless Store Manager Eric Thompson testified that the phone number listed for Vargas was the same as the phone found on his body and that the subscriber for number 490–8035 was Dixon. The records for Vargas's phone reflected outgoing calls to number 490–8035 at 2:48 a.m., 2:55 a.m., and 2:59 a.m. on June 15, 2009.

## I. Sufficiency of the Evidence

Although Dixon raised his argument that there was insufficient evidence to sustain his conviction of capital-felony murder with the underlying felony of aggravated robbery as his fourth point on appeal, we address such a challenge first for purposes of double jeopardy. *See Sweet v. State*, 2011 Ark. 20, 370 S.W.3d 510. The first step in our analysis of the sufficiency of the State's evidence is to examine Dixon's motion for a directed verdict. *Holt v. State*, 2011 Ark. 391, 384 S.W.3d 498. At the close of the State's case-in-chief, Dixon's counsel moved for a directed verdict, stating that there was insufficient evidence of a robbery and that there was insufficient evidence that Dixon actually caused the death of Vargas.[3] Dixon's counsel renewed his motion at the conclusion of Dixon's case-in-chief.

This court has held that a motion for a directed verdict is treated as a challenge to the sufficiency of the evidence. *Taylor v. State*, 2011 Ark. 10, 370 S.W.3d 503. The appellate court reviews the evidence in the light most favorable to the State and considers only the evidence that supports the verdict. *Id.* This court affirms a conviction if substantial evidence exists to support it. *Norris v. State*, 2010 Ark. 174, 368 S.W.3d 52. Substantial evidence is evidence—either direct or circumstantial—that is of sufficient force and character that it will, with reasonable certainty, compel a conclusion one way or the other, without resorting to speculation or conjecture. *Haynes v. State*, 346 Ark. 388, 58 S.W.3d 336 (2001).

Circumstantial evidence may constitute substantial evidence to support a conviction. *Ross v. State*, 346 Ark. 225, 57 S.W.3d 152 (2001). To be substantial evidence, the evidence must exclude every other reasonable hypothesis than that of guilt of the accused. *Id.* The question of whether circumstantial evidence excludes every other reasonable hypothesis consistent with innocence is for the jury to decide. *Id.* Guilt can be established without eyewitness testimony, and evidence of guilt is not less because it is circumstantial. *Id.* Overwhelming evidence of guilt is not required in cases based on circumstantial

---

3. Dixon also argued in his directed-verdict motion that there was insufficient evidence that he caused the death of Vargas with a premeditated and deliberate purpose. Because the jury convicted him of capital-felony murder, it is not necessary to address his challenge to evidence of premeditation.

evidence; the test is one of substantiality. *Id.*

To obtain a conviction for capital-felony murder, the State was required to prove that acting alone or with one or more persons, Dixon committed or attempted to commit aggravated robbery and in the course of or in furtherance of the aggravated robbery, Dixon, or an accomplice, caused the death of Vargas under circumstances manifesting extreme indifference to the value of human life. Ark. Code Ann. § 5–10–101(a)(1) (Repl.2006). Under this subsection of the capital-murder statute, the State must first prove the underlying felony of aggravated robbery. *See Hall v. State,* 361 Ark. 379, 206 S.W.3d 830 (2005). A person commits robbery if, with the purpose of committing a felony or misdemeanor theft, the person employs or threatens to immediately employ physical force upon another person. Ark.Code Ann. § 5–12–102(a) (Repl.2006). Aggravated robbery occurs when a person commits robbery as defined above and inflicts or attempts to inflict death or serious physical injury upon another person. Ark. Code Ann. § 5–12–103(a)(3) (Repl.2006). A person commits theft of property if he knowingly takes or exercises unauthorized control over the property of another person with the purpose of depriving the owner of the property. Ark.Code Ann. § 5–36–103(a)(1) (Repl.2006). The intent to commit a robbery may be inferred from the facts and circumstances in a case. *Harper v. State,* 359 Ark. 142, 194 S.W.3d 730 (2004).

Viewing the evidence in the light most favorable to the State, there is sufficient evidence to support Dixon's capital-felony murder conviction. The last number dialed, 490–8035, on Vargas's cellular phone was to a phone registered to Dixon. Dixon claimed that he lost the telephone with the number matching the last call made by Vargas. However, Dixon's girlfriend and another friend both testified that they talked to Dixon on that cellular phone on the day before and the day of the murder. Dixon admitted to the police that he sold drugs, and Rosalie Vargas testified that her husband admitted to using drugs. Dixon drove a red Tahoe, and Rosalie saw someone in what she identified as a red "Suburban" place something in their mailbox a few weeks before the murder. Dixon told Smith, a fellow inmate, that the method he used to deliver drugs to Vargas was by leaving the drugs in Vargas's mailbox. The police investigation revealed that Vargas was known to buy drugs from the driver of a red Tahoe, which appeared occasionally at Vargas's home.

Rosalie told the police that Vargas's wallet, which was at their house on June 16, had approximately $3000 missing, and one of Vargas's co-workers testified that Vargas had been recently paid $2500 by his employer. When the police searched Vargas's body, he had $20, and the jail records reflected that when Dixon was booked on June 18, he had $2900 in his possession.

Furthermore, Smith testified that Dixon confessed to selling drugs to Vargas, robbing and shooting him, and then leaving him on the road with "rabbit ears" pockets. Smith stated that Dixon said that it was necessary to murder Vargas to prevent him from identifying Dixon. The medical examiner confirmed that the numerous abrasions on Vargas's body were consistent with someone skidding over a hard surface for some distance. One of Vargas's shoes was found in the street approximately two houses away from where his body was discovered. Dixon disclosed to Smith that he threw the murder weapon into Spring Lake, and later a gun matching the caliber of the murder weapon was recovered from Spring Lake. Based on the foregoing evidence, we hold

that the circuit court did not err in denying Dixon's motion for a directed verdict.

## II. *Evidentiary Challenges*

 Challenges to the admissibility of evidence are left to the sound discretion of the circuit court, and a judge's ruling on these matters will not be reversed absent an abuse of discretion. *Lacy v. State,* 2010 Ark. 388, 377 S.W.3d 227. Abuse of discretion is a high threshold that does not simply require error in the trial court's decision, but requires that the trial court acted improvidently, thoughtlessly, or without due consideration. *Grant v. State,* 357 Ark. 91, 161 S.W.3d 785 (2004). Moreover, we do not presume that prejudice results from an evidentiary error, and thus, we will not reverse a trial court's ruling unless the appellant demonstrates prejudice. *Gaines v. State,* 340 Ark. 99, 8 S.W.3d 547 (2000).

### A. Drug Activity

 Dixon argues that the circuit court erred in admitting testimony from two police detectives and Smith regarding his admission that he sold drugs. Dixon objected below to the introduction of the evidence, and the circuit court ruled that testimony regarding Dixon's drug activities was limited to the particular time frame surrounding the death of Vargas. On appeal, Dixon contends that "selling drugs is not akin to robbery or homicide," offenses for which he was charged,[4] and

therefore, the testimony was inadmissible pursuant to Arkansas Rules of Evidence 404(b) and 403.[5]

 Rule 404(b) provides that "[e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of the person in order to show that he acted in conformity therewith." Ark. R. Evid. 404(b) (2011); *see also Osburn v. State,* 2009 Ark. 390, 326 S.W.3d 771, *cert. denied,* —— U.S. ——, 130 S.Ct. 1522, 176 L.Ed.2d 113 (2010). Such evidence may be "admissible for other purposes." Ark. R. Evid. 404(b) (2011). Evidence offered under Rule 404(b) must be independently relevant, having a tendency to make the existence of any fact of consequence to the action more or less probable than it would be without the evidence. *Gaines v. State, supra.*

 Evidence of other crimes by the accused, not charged in the indictment or information, and not a part of the same transaction, is not admissible at the trial of the accused; however, evidence of other crimes is admissible under the res gestae exception to establish the facts and circumstances surrounding the alleged commission of the offense. *Gaines v. State, supra; Haynes v. State,* 309 Ark. 583, 832 S.W.2d 479 (1992); *Young v. State,* 269 Ark. 12, 598 S.W.2d 74 (1980). Under the res gestae exception, the State is entitled to introduce evidence showing all circumstances that explain the charged act.

---

4. Dixon was charged by criminal information dated July 30, 2009, with one count of capital-felony murder with robbery as the underlying felony. At the conclusion of the State's case-in-chief, the State requested permission to amend the information. Defense counsel responded that "we have no objection to the amendment," and the circuit court permitted the State to amend the information to charge Dixon with capital-felony murder with aggravated robbery as the underlying felony.

5. The State argues that Dixon has changed his argument on appeal. Specifically, the State contends that Dixon's statement in his appellate brief that he admitted to the police "to selling marijuana, but denied selling cocaine" is different than the argument he advanced below. We disagree. Before the circuit court, Dixon sought preclusion "of any mention of allegations of controlled substance activity." Dixon's argument has not changed on appeal.

*Gaines, supra.* Specifically, all of the circumstances connected with a particular crime may be shown to put the jury in possession of the entire transaction. *Thessing v. State,* 365 Ark. 384, 230 S.W.3d 526 (2006). Where separate incidents are intermingled with the crime actually charged, the evidence is admissible. *Henderson v. State,* 284 Ark. 493, 684 S.W.2d 231 (1985). Res gestae testimony and evidence that explains the charged act is presumptively admissible as an exception to the general prohibition on admitting evidence of uncharged crimes. *Thessing, supra.*

Here, evidence that Dixon sold drugs during the particular time frame surrounding Vargas's murder was not offered to prove Dixon's character or to show that he acted in conformity therewith. Such testimony was an integral and interwoven part of the circumstances surrounding the murder and robbery and explained the scope and nature of the interactions between Dixon and Vargas. Because testimony that Dixon sold drugs constituted res gestae evidence, we find no abuse of discretion in the circuit court's admission of such evidence.

■■■■■ Dixon argues that even if evidence that he sold drugs is admissible, the prejudicial effect greatly outweighs any probative value of such testimony. Rule 403 provides that "[a]lthough relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Ark. R. Evid. 403 (2011). While Dixon made his Rule 403 argument to the circuit court, he did not obtain a ruling on it. It is an appellant's burden to obtain a clear ruling on an issue from the trial court. *Woodall v. State,* 2011 Ark. 22, 376 S.W.3d 408. Absent such a ruling, there is nothing for this court to review. *Maxwell v. State,* 373 Ark. 553, 285 S.W.3d 195 (2008). Here, Dixon did not receive a ruling from the circuit court regarding his Rule 403 argument; accordingly the issue is not preserved for our review.

### B. Hearsay

Dixon contends that the circuit court abused its discretion when it overruled his objections to two alleged hearsay statements. Hearsay is a statement, other than the one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted. Ark. R. Evid. 801(c) (2011).

■■■■■ First, Dixon challenges Detective Nall's testimony regarding information he received from the criminal-investigation division of the police department linking the victim to a vehicle often driven by Dixon. Specifically, he stated that the vehicle had been seen at the home of the victim, that the victim had gotten into the vehicle, and that the victim was known to buy drugs from the driver of the vehicle. We have held that testimony introduced to explain an officer's actions in pursuing and apprehending a suspect is not hearsay. *See Skiver v. State,* 336 Ark. 86, 983 S.W.2d 931 (1999). Such statements are admissible to show that the statements were made as opposed to showing the truth of the matter asserted. *Id.* Because the challenged evidence shows the basis of Nall's actions during the investigation, it was not hearsay, and the circuit court did not abuse its discretion in admitting the testimony.

■■■■■ Next, Dixon contends that Nall's testimony concerning statements made to him by Felicia Robertson was hearsay. Specifically, Nall testified that during the investigation, Robertson stated

that Dixon called her around midnight on June 14, 2009, and that she showed Nall her phone logs, which verified her assertion. The circuit court's basis for overruling Dixon's hearsay objection was that Robertson was present and would testify during the trial. When Robertson testified, she confirmed her statement to Nall, but Dixon chose to forego the opportunity during cross-examination to pursue the issue. We need not decide whether Nall's testimony was hearsay, as any error in its admission was harmless. The availability of a declarant for cross-examination renders harmless any error caused by the admission of hearsay. *Gatlin v. State*, 320 Ark. 120, 895 S.W.2d 526 (1995).

## C. Autopsy Photographs

Dixon argues that the circuit court abused its discretion by admitting into evidence five autopsy photographs of Vargas's body. Specifically, he asserts that they were inflammatory, that they were not relevant, and that their probative value is substantially outweighed by the danger of unfair prejudice pursuant to Arkansas Rule of Evidence 403. At trial, defense counsel objected to the photographs, stating that because "the testimony established that Mr. Vargas was deceased[,] [t]hese pictures just are more prejudicial than probative, and therefore, I would submit to the Court that under [Rule] 403 that they are improper."

Arguments not raised at trial will not be addressed for the first time on appeal. *Pearcy v. State*, 2010 Ark. 454, 375 S.W.3d 622. An objection to a photograph must be sufficiently specific to apprise the circuit court of the particular error complained of; otherwise, the right of appellate review is not preserved. *Id.* Because Dixon never objected to the photographs as inflammatory or irrelevant before the circuit court, a challenge to the

admissibility of the photographs on either of these grounds is not preserved for appellate review. A party is bound by the scope and nature of the arguments made at trial and may not enlarge or change those grounds on appeal. *Frye v. State*, 2009 Ark. 110, 313 S.W.3d 10.

Dixon did, however, preserve the Rule 403 objection. Photographs are ordinarily admissible when helpful to explain testimony. *Marcyniuk v. State*, 2010 Ark. 257, 373 S.W.3d 243. Even the most gruesome photographs may be admissible to assist the trier of fact by shedding light on some issue, by proving a necessary element of the case, by enabling a witness to testify more effectively, by corroborating testimony, or by enabling jurors to better understand the testimony. *Sweet v. State*, 2011 Ark. 20, 370 S.W.3d 510. Further considerations in admitting photographs include whether they show the condition of the victim's body and the probable type or location of the injuries. *Miller v. State*, 2010 Ark. 1, 362 S.W.3d 264. A circuit court, however, must not apply a carte blanche approach to admission of a photograph and must consider whether the picture creates a danger of unfair prejudice that substantially outweighs its probative value. *Id.*

There were five autopsy photographs admitted into evidence: two showed a laceration on the victim's shaved scalp, one illustrated a gunshot wound to the chest, and two depicted lacerations on various parts of the victim's body. These photographs were admitted through the testimony of Dr. Erickson, and he referenced them as he testified. Our review of the record reveals that Dr. Erickson used the pictures to enhance and clarify his testimony regarding the condition of the body when his office received it. The pictures also helped explain how the injuries Vargas received were consistent with his

having skidded for some distance over a rough surface. Here, the probative value of the photographs outweighed any prejudicial effect. Therefore, we hold that the circuit court did not abuse its discretion in allowing the photographs to be admitted.

### III. *Mistrial*

Finally, Dixon argues that the circuit court abused its discretion when it denied his motion for a mistrial. After Hayes completed his testimony, the court released him as a witness. Hayes then stated, "And to the family, I'm sorry for y'all's loss." Defense counsel objected, requesting an admonishment because the statement was nonresponsive. In addition, counsel moved for a mistrial, arguing that the statement created sympathy and poisoned the minds of jurors to the extent that the case should be dismissed. The circuit court denied the motion for a mistrial and stated that it would give an admonition if the defense wanted it. In response, defense counsel stated that he did not wish to waive the objection and requested the general instruction that the jury not allow prejudice or sympathy to influence their decision.

A mistrial is a drastic remedy that should only be granted when justice cannot be served by continuing the trial. *Taylor v. State*, 2010 Ark. 372, 372 S.W.3d 769; *Jackson v. State*, 368 Ark. 610, 249 S.W.3d 127 (2007). The circuit court has the sound discretion to decide whether to grant a mistrial, and this decision will not be overturned absent a showing of abuse or upon manifest prejudice to the complaining party. *Green v. State*, 365 Ark. 478, 231 S.W.3d 638 (2006); *Jones v. State*, 340 Ark. 390, 10 S.W.3d 449 (2000). Additionally, even if a remark is improper, the circuit court may deny the mistrial motion and cure any prejudice by issuing a jury admonishment to disregard the remark.

*Smith v. State*, 351 Ark. 468, 95 S.W.3d 801 (2003). Refusing an offer of an admonition may preclude a finding of prejudice. *Gardner v. State*, 296 Ark. 41, 754 S.W.2d 518 (1988); *Birchett v. State*, 294 Ark. 176, 741 S.W.2d 267 (1987). A mistrial is only appropriate when it is obvious that prejudice cannot be removed by any other means. *Webb v. State*, 327 Ark. 51, 938 S.W.2d 806 (1997).

Here, Dixon has not shown how he was prejudiced by Hayes's statement. The expression of sympathy did not reflect upon Dixon's guilt or implicate him directly. Additionally, the circuit court's offer to issue an admonition to the jury was not accepted by defense counsel. Under these circumstances, we find no abuse of discretion in the circuit court's denial of a motion for a mistrial.

### IV. *Rule 4–3(i)*

The record in this case has been reviewed for prejudicial error in accordance with Arkansas Supreme Court Rule 4–3(i) (2011), and none has been found.

Affirmed.