SLIP OPINION

Cite as 2014 Ark. App. 478

# ARKANSAS COURT OF APPEALS

DIVISION II
No. CR-13-1118

| | | |
|---|---|---|
| | | Opinion Delivered SEPTEMBER 17, 2014 |
| TERRY DETHEROW | | APPEAL FROM THE PULASKI |
| | APPELLANT | COUNTY CIRCUIT COURT, |
| | | FIRST DIVISION [NO. CR-12-2256] |
| V. | | |
| | | HONORABLE LEON JOHNSON, |
| | | JUDGE |
| STATE OF ARKANSAS | | |
| | APPELLEE | AFFIRMED |

## KENNETH S. HIXSON, Judge

Appellant Terry Detherow appeals his convictions for manslaughter and third-degree battery, asserting reversible error on the basis that the trial judge abused his discretion on two evidentiary rulings. One ruling permitted the State to introduce evidence regarding facial injuries on his girlfriend, and the other ruling refused the defense permission to call the prosecuting attorney as a witness during trial to impeach State witnesses. Because the trial court did not abuse its discretion, coupled with appellant's failure to demonstrate resulting prejudice even had such an abuse of discretion been shown, we affirm.

Appellant was charged with the first-degree murder of John Jacob Mosley and the first-degree battery of Charles Edward Wilmoth following a shooting on the night of an annual party held in Scott, Arkansas. Appellant contended that he pulled his gun from his pocket in self defense when he felt physically threatened by party-goers, and in a struggle over the gun,

it discharged at least twice, resulting in the fatality and injury. A Pulaski County Circuit Court jury found him guilty of the lesser-included offenses of manslaughter and third-degree battery. The jury sentenced appellant to an aggregate of 540 months in prison, enhanced because he was a habitual offender and because the jury found that he committed manslaughter with a firearm.

Several persons in attendance at the party testified at the trial. John Arthur Mosley, uncle to the deceased John Jacob Mosley, testified that he lived in Scott, Arkansas. It was his property where the annual all-day crawfish party was held, and he estimated that about 150 people attended. He said that the children would fish and play in the Scott Bayou; there was a stage for a band; there were horses; and food was served from approximately 4:00 p.m. until dark. Some people brought campers and tents to the property. He did not see, but he did hear, shots being fired. He ran to the scene, finding his thirty-seven-year-old nephew on the ground, bleeding and with a bullet hole in his chest. He drove him to the hospital, but his nephew did not survive.

Amber Rice testified that when her friend Tammy Davis arrived at the party that day, Tammy took off her sunglasses, revealing a black eye. Amber asked Tammy what happened, and Tammy told her that her boyfriend Terry Detherow (appellant) did it. Later, Amber realized that Detherow had a pistol in his pocket, and when she asked him why he had a gun, he told her it was for his protection at his barber shop. Amber later saw Detherow holding a gun, walking out of the party.

Candice Sanchez testified she arrived at about 7:30–8:00 that night and that she did not know Tammy Davis or Detherow before the party. Sanchez became aware that Detherow had punched a man, who was on the ground bleeding. Detherow appeared to be angry, yelling at the man he hit. When she asked Detherow why he hit the person, Detherow responded by throwing his arms up and saying, "Come on, f★★k you, I'm from the country, b★★ch." Sanchez said that four or five other people were within reaching distance of Detherow, telling Detherow to leave, but she did not see anyone touch him. Detherow then began to back away, saying, "Y'all want some?" and pulling out his gun. Sanchez testified that Detherow raised the gun and shot it into the air. She ran away to the woods but heard two more shots. Later, she saw Detherow standing at the exit gate, still holding the gun.

Lasa Robertson testified that she was a longtime friend of the Mosley family. She observed Detherow, Tammy Davis, Tony Givens, and Gary Ross under a nearby tent canopy. She heard Detherow being loud, calling Tammy foul names and telling her to get up and leave with him. Robertson saw that Tammy had a black eye and was drunk; Robertson assumed she did not want to go with Detherow when she did not get up on his command. She witnessed Gary Ross stand behind Tammy's chair and tell Detherow, "She's not going with you." Detherow threatened and then punched Ross in the jaw. As she reached for Detherow's arm and asked him to leave, she testified that he turned to her and said, "I'll drop a b★★ch . . . any b★★ch," which she took as a threat. She saw Detherow pull a gun from his pocket and fire it into the air. She left the scene but heard two more shots fired.

3

Fayburn Jason Coffman testified that although he did not see the altercation between Gary Ross and Detherow, he saw Ross on the ground after being hit, and Detherow was "hollering, screaming, and pointing." Coffman said he and another man approached Detherow and asked him to leave, not in a threatening manner and with no one touching Detherow, but Detherow continued to be aggressive and mouthy. Detherow pulled out a gun, threatened them to back off or he would shoot, pointed the gun in the air, and fired. Coffman said that there were a lot of children in the area, and he tried to move them back for safety. Coffman said that "Big Ed" tried to get the gun away and that he saw John Jacob trying to help push the gun away, but Detherow shot John Jacob, who fell to the ground.

Charles Edward ("Big Ed") Wilmoth, who was also struck by one of the gunshots, testified that he worked for the Mosley family and had known them for thirty years. Wilmoth became aware that Detherow had a gun when he saw Detherow pull it out of his pocket. Wilmoth said that he grabbed the gun and struggled with Detherow to take it away but that it discharged up in the air. Wilmoth was shot in the face, sustaining injuries to his eyes, nose, and the skin in the middle of his face. He also sustained an injury to his finger in the struggle to keep the gun from firing. Wilmoth denied anyone threatening Detherow, and he testified that he saw Detherow pull the trigger and shoot John Jacob.

Gary Ross, who was very familiar with the Mosley family and Detherow, testified that he walked into a tent area and found Tammy Davis sitting in his chair; he began to talk to her. Ross believed that Tammy was intoxicated. Detherow eventually approached and told Tammy that they were leaving the party, but she replied that she did not want to leave. He

4

heard Detherow ask her, "Do you want to be with this motherf★★ker, motherf★★ker?" Ross said that he told Detherow that she did not have to leave with him, but Detherow punched him in the face, knocking him to the ground.

Stacey Mosley testified she knew Detherow but not Tammy Davis. She noticed that Tammy had a black eye. She did not see the altercation nor did she see the shots fired, but she saw John Jacob on the ground. She confirmed that children were in the immediate area. She testified that after the shooting, Detherow approached her near the exit gate and calmly told her that it was Tammy's decision, not other people's, whether or not Tammy would be going home with him that night.

Brian Southerland, a thirteen-year-old boy, testified that he knew John Jacob Mosley, Ed Wilmoth, and Terry Detherow. Southerland was a few yards away when the incident occurred. He said that everyone wanted Detherow to leave, and he could hear a girl say that she was not going. Southerland watched Detherow take a few steps and pull out a gun. He confirmed that Wilmoth struggled over the gun and got shot in the face. Southerland said that neither Wilmoth nor John Jacob were touching the gun when Detherow shot John Jacob in the chest.

A sheriff's investigator testified that, based on cellular telephone signals, law enforcement was able to locate Detherow several hours later at a nearby Travel Lodge, where they found Detherow and Tammy Davis asleep in bed. The investigator saw that Tammy had what appeared to be an "extremely swollen" and still bloodied "busted lip" that "appeared to be recent." He also saw that Tammy had a black eye. Both Tammy and Detherow

appeared to be intoxicated. Tammy told the investigator, "It just seems like he just probably backhanded me." When asked if the lip injury happened after they left the party, Tammy replied that she thought so, but she had no specific recollection of it.

Detherow's mother, Bonnie Detherow, testified that she picked up her son and Tammy Davis after he called her for a ride around 10:15 p.m. She drove them home, but later, Detherow had her take him and Tammy to a nearby hotel because he was scared. She said that Tammy fell and busted her lip as they left to go to the hotel. She admitted that she lied to law enforcement by telling them she did not know where her son was because she wanted to protect him. Detherow's mother testified that she was the one who gave Tammy a black eye in a physical altercation they had a few days earlier when Tammy was drunk.

Tammy Davis testified that she had lived with Detherow since 2008. Tammy acknowledged having a black eye at the time of the party, but she denied Detherow causing it; she admitted that she led other people to believe that Detherow did it. Tammy said that Detherow's mother was the one who gave her the black eye several days prior to this party. Tammy did not remember a lot of details about that night because she became progressively more drunk, presumably in a black out when the fighting and shooting took place. Tammy did not remember what happened to her lip and did not recall telling officers that Detherow had busted her lip.

Terry Detherow took the stand in his own defense. Detherow testified that he and most of his mother's family lived in Scott, Arkansas, where he operated a barber shop. Detherow testified that he never intended to hurt or kill anyone that night; he only pulled out

his gun "to get him [Ed Wilmoth] off of me because he was threatening me." He said that he and Tammy were taken to the party at about 4:30 p.m., and he had only five beers over the course of the evening. He said that there were no problems until he found Tammy under the tent with a big bottle of whiskey by her side. He was frustrated about her drinking, which was a persistent problem between them; that night, she had become "sloppy drunk." Tammy denied having consumed whiskey, he called her a damn liar, and he told her "let's go." Detherow said that he was about to help Tammy get up when Gary Ross told him not to talk to her that way and to leave Tammy alone. Detherow told Ross to mind his own business, that he and Tammy lived together, and that his mother was on her way to pick them up to take them home. Detherow testified that Ross threatened to "kick my ass," took a few steps toward Detherow and got "in my face," so he reflexively swung at Ross and knocked him to the ground.

Detherow testified that, at that point, three or four people were yelling and coming at him, and he heard a threat that they would "have to beat that son–of–a–b★★ch's brains out." He denied threatening Lasa Robertson. According to Detherow, he was backing up and reaching into his pocket, pulling the hammer back on his gun, his intent being only to fire up into the air to get them to back off. Wilmoth, however, grabbed and pulled on Detherow's hand and gun. He explained, "I shot because they were coming after me." After it was over, Detherow said he walked to the gate to wait for his mother, his gun still in his hand. He said that after he arrived at the hotel, he called his mother and talked to detectives, agreeing that

7

in the morning he would turn himself in. Detherow confirmed his mother's account of how Tammy sustained a black eye and hurt her own lip; he denied hitting Tammy.

The jury entered guilty verdicts on the lesser-included offenses of manslaughter and third-degree battery. Following sentencing, appellant filed a timely notice of appeal from the judgment of conviction.

On appeal, appellant contends that the trial court erroneously (1) denied a pretrial motion in limine and permitted the State to present testimony that Tammy had a black eye and busted lip, which appellant claims was irrelevant, unduly prejudicial, and improper under Ark. R. Evid. 404(b); and (2) denied the defendant's request to have the prosecutor sworn in as a witness to discredit the testimony of several State's witnesses, to the extent that some details they swore were given to the State were not. The standard of review for an evidentiary ruling is whether the trial court abused its discretion. *Boyle v. State*, 363 Ark. 356, 214 S.W.3d 250 (2005). We hold that the trial court did not abuse its discretion.

First, defense counsel filed a pretrial motion in limine to prevent the State from introducing any "mention or reference to Tammy Davis' busted lip and/or black eyes," citing to Ark. R. Evid. 402, 403, and 404. Appellant argued that this evidence had no relevance to the murder and battery charges for which he was being tried, especially where Detherow did not cause those injuries, it was overly prejudicial, it would confuse the issues, and it would be inappropriate "bad acts" evidence under Ark. R. Evid. 404(b). Appellant contended that this would be presented to the jury only for the purpose of establishing him to be a violent abusive man and thus inadmissible character evidence. The prosecutor responded that what

8

Tammy told witnesses and how she looked were part and parcel of the circumstances surrounding the crimes, and as res gestae, the jury was entitled to know the circumstances that led to the shooting, why the people at the party behaved as they did, and what was observed. The trial court agreed, denying the motion in limine but limiting the State's inquiry to what people saw and heard.

A trial court's decision to admit or exclude evidence is reviewed under an abuse-of-discretion standard. *Jones v. State*, 2011 Ark. App. 324, 384 S.W.3d 22. Arkansas Rule of Evidence 404(b) prohibits the introduction of evidence of "other crimes, wrongs, or acts" to prove the character of a person in order to show that he acted in conformity with that in committing the crime or crimes charged. Such evidence, however, may be admissible for other purposes enumerated in Rule 404(b). Evidence is admissible under the res gestae exception to establish facts and circumstances surrounding the commission of an offense. *Payton v. State*, 2009 Ark. App. 690; *Ellis v. State*, 101 Ark. App. 20, 270 S.W.3d 377 (2007). This rule establishes that the State may introduce evidence showing all of the circumstances connected with and contemporaneous to a particular crime to put the jury in possession of the entire transaction. *Thessing v. State*, 365 Ark. 384, 230 S.W.3d 526 (2006); *Bledsoe v. State*, 344 Ark. 86, 39 S.W.3d 760 (2001). Res gestae testimony and evidence is presumptively admissible. *Dixon v. State*, 2011 Ark. 450, 385 S.W.3d 164.

Here, several witnesses described that they saw Tammy's black eye, Tammy admitted that she led people to believe that Terry Detherow had inflicted it, and appellant, his mother, and Tammy were permitted to testify that Detherow did not cause it. The arresting officer

SLIP OPINION

testified that when he found Tammy and Detherow at the hotel hours later, Tammy had a black eye and what appeared to be a freshly busted lip. Although Detherow, his mother, and Tammy explained at trial that Tammy caused her own lip injury, it was entirely permissible for the officer to explain what he observed and that Tammy believed, albeit uncertain given her intoxication, that Detherow hit her. This evidence was not admitted for the purpose of proving that Detherow, in fact, inflicted those injuries to Tammy's face. The visible injuries were simply evidence of the circumstances that existed that night. The trial court did not abuse its discretion by denying the motion in limine.

Second, appellant argues that the trial court abused its discretion by not allowing the defense to put the prosecutor on the stand. The defense sought to have the prosecutor testify that some of the State's witnesses did *not* convey certain details of their trial testimonies to the State prior to trial, in contrast to the witnesses swearing that they did, because certain details were different or missing from the prosecutor's written witness summaries. Appellant wanted to attack the witnesses' credibility on that point—whether they had, in fact, informed the State of those particular details not revealed in the prosecutor's written summaries. Defense counsel did not, and does not, allege that the State committed any discovery violation.

We hold that the evidence of which appellant complains (details from three State witnesses) is insignificant and cumulative. Fayburn Coffman and Stacey Mosley testified at trial that there were children in the vicinity during the shooting. The summaries of the interviews of these two witnesses did not contain any information regarding children being in the vicinity of the shooting or concerns about their safety. Candace Sanchez testified at

SLIP OPINION

trial that, during her conversation with appellant, he was "standing." In the prosecutor's summary, it stated that appellant was "sitting."

In discussing these issues with the trial judge, the prosecutor stated that she provided brief summaries in a good-faith attempt to provide adequate and fair disclosures of her recollections, and that "I don't know that I can stipulate to every single thing [the witness] told me." The prosecutor urged defense counsel to cross-examine the witnesses on the perceived inconsistencies. The trial judge denied the request to have the prosecutor testify.

Appellant concedes that there is no case law directly on point. Undoubtedly, credibility of witnesses is always an issue, is always relevant, and is subject to attack by any party. *VanOven v. State*, 2011 Ark. App. 46, 380 S.W.3d 507. Extrinsic evidence of a prior inconsistent statement by a witness is not admissible unless the witness is afforded an opportunity to explain or deny it, the opposing party is afforded an opportunity to explain or deny it, and the opposing party is afforded an opportunity to interrogate the witness on that issue. Ark. R. Evid. 613(b). A statement is inconsistent when a reasonable person could infer on comparing the whole effect of the two statements that they have been produced by inconsistent beliefs. *Kennedy v. State*, 344 Ark. 433, 42 S.W.3d 407 (2001). We hold that the trial court did not abuse its discretion in denying the defense's request to call the prosecutor to testify.

Regarding the trial testimony about the presence of children, we affirm the trial court's decision because their testimonies were not inconsistent with the witness summaries. Instead, that detail is missing from the brief summaries, not contradictory with them. Moreover, the

prosecutor represented to the trial court that she would be unable to verify every single detail that the witnesses conveyed to her. Thus, the prosecutor's testimony would not provide a means to attack witness credibility on this particular point.

As for the other testimony about whether appellant was "standing" versus "sitting," as recited in the summary, the trial court permitted defense counsel to ask the witness to explain. In response to a defense question to clarify, Sanchez said, "he was standing, she was squatting, I mean, they [Terry Detherow and Tammy Davis] were just around where we were sitting." Defense counsel did not confront Sanchez with any perceived inconsistency or accusation of fabrication. The witness summary provided in discovery is not materially different when considered in light of Sanchez's explanation. Having the prosecutor testify would not achieve the goal of impeaching this witness's credibility either. The trial court did not abuse its discretion in refusing to permit defense counsel to call the prosecutor as a witness.[1]

Appellant has not demonstrated reversible error, and thus we affirm appellant's convictions.

Affirmed.

PITTMAN and WALMSLEY, JJ., agree.

*James Law Firm*, by: *William O. "Bill" James, Jr.*, for appellant.

*Dustin McDaniel*, Att'y Gen., by: *Rachel H. Kemp*, Ass't Att'y Gen., for appellee.

---

[1]We point out that appellant abandoned his alternative argument made to the trial court that a State's stipulation should have been ordered, acknowledging that no trial court error would exist in refusing to order such a stipulation. Appellant also abandoned his alternative argument that a mistrial should have been declared. Our focus is, therefore, on the denial of the defense request to call the prosecutor as a witness to impeach the State witnesses' credibility.